The PACKAGE SHOP, INC., and Shalbor, Inc., t/a Butler's Liquor Store, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

ANHEUSER–BUSCH, INC., Crown Beer Distributors, Inc., Garden State Beverage Co., Harrison Beverage Co., High Grade Beverage t/a Mine Hill Distributing Company or High Grade Mine Hill, Hub Beer Distributors, Hub City Distributors, Inc., Konrad Beer Distributors, Inc., The Kristen Distributing Co., MS & W Distributors, Inc., Point Pleasant Distributors, Inc., Ritchie & Page Distributing Co., Inc., South Jersey Distributors Corp., Trip Distributors, Inc., and Warren Distributing Co., Defendants.

Civ. A. No. 83–0513.

United States District Court,
D. New Jersey.

Oct. 19, 1987.

Hellring, Lindeman, Goldstein, Siegal & Stern by Jonathan L. Goldstein, Charles A. Oransky, Irwin P. Burzynski, Bruce S. Etterman, Newark, N.J., for plaintiffs.

Howrey & Simon by Peter E. Moll, Terrence C. Sheehy, Edwin H. Wheeler, Carmine R. Zarlenga, Washington, D.C. and Connell, Foley & Geiser by Richard D. Catenacci, Roseland, N.J., for Anheuser–Busch, Inc.

Robinson, Wayne, Levin, Riccio & La Sala by Thomas D. Ruane, Joseph F. Lagrotteria, Paul J. Linker, Newark, N.J., for Crown Beer Distributors, Inc.

Mattson, Madden & Polito by Andrew S. Polito, Newark, N.J., for Harrison Beverage Co.

Soriano & Gross by Daniel C. Soriano, Jr., Somerville, N.J., for High Grade Beverage.

Clapp & Eisenberg by William J. O'Shaughnessy, Frederick S. Kessler, Ka-

thy M. Hooke, Newark, N.J., for Konrad Beer Distributor, Inc.

Cummins, Dunn & Pashman by Robert E. Rochford, Hackensack, N.J., for Ritchie & Page Distributing Co., Inc.

Ellenport, Holsinger & Lehn, P.A. by John R. Holsinger, Roseland, N.J., for Hub Beer Distributors, Inc. and Hub City Distributors, Inc.

Paul Van Embden, Vineland, N.J., for Garden State Beverage Co.

Mackenzie, Welt, Duane & Maher by John D. North, Felice Londa, Woodbridge, N.J., for The Kristen Distributing Co.

Mc Glynn, Reed, Hense & Pecora by William E. McGlynn, Point Pleasant, N.J., for Point Pleasant Distributors.

Perskie, Nehmad & Grossman by John L. Grossman, Atlantic City, N.J., for South Jersey Distributors Corp.

Jeffer, Hartman, Hopkinson, Vogel, Coomber & Pfeiffer by Jerome A. Vogel, Richard J. Allen, Jr., Hawthorne, N.J., for Trip Distributors, Inc.

Flynn & Goracy by Edward R. Goracy, Westfield, N.J., for Warren Distributing Co.

**OPINION**

DEBEVOISE, District Judge.

**I. INTRODUCTION**

The second amended complaint in this action, brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.,* and the New Jersey Antitrust Act, N.J.S.A. 56:9–1, *et seq.,* alleges a horizontal conspiracy to allocate exclusive distributor territories among the wholesalers of Anheuser–Busch ("A–B") and Miller Brewing Company ("Miller") malt beverage products in the State of New Jersey. Plaintiffs represent a certified class of New Jersey beer retailers. Defendants are distributors engaged in the business of selling A–B or Miller beer at wholesale to the plaintiff class of New Jersey retailers. The defendants which sold A–B beer are A–B/Newark; Crown Beer Distributors, Inc. ("Crown Beer"); Harrison Beverage Co. ("Harri-

son"); High Grade Beverage ("High Grade"); Konrad Beer Distributor, Inc. ("Konrad"); and Ritchie & Page Distributing Co., Inc. ("Ritchie & Page") (collectively referred to as "the A–B defendants"). Other than A–B/Newark, which is part of and operated by the Wholesale Operations Division of Anheuser–Busch, Inc., a Missouri corporation ("A–B/St. Louis"), the A–B defendants are all incorporated in New Jersey. The defendants which sold Miller beer are Garden State Beverage Co. ("Garden State"); Hub Beer Distributors, Inc. ("Hub Beer"); Hub City Distributors, Inc. ("Hub City"); The Kristen Distributing Co. ("Kristen"); MS & W Distributors, Inc. ("MS & W"); Point Pleasant Distributors, Inc. ("Point Pleasant"); South Jersey Distributors Corp. ("South Jersey"); Trip Distributors, Inc. ("Trip"); and Warren Distributing Co. ("Warren") (collectively referred to as "the Miller defendants").

The A–B defendants and the Miller defendants each jointly move for summary judgment.

**II. PROCEDURAL BACKGROUND**

Plaintiffs commenced this action in February 1983 by verified complaint against 70 malt beverage brewers and wholesale distributors alleging three separate categories of conspiracies to allocate territories and customers for the sale of beer at wholesale in New Jersey: 1) a horizontal conspiracy among the brewers; 2) a horizontal conspiracy among the distributors; and 3) vertical conspiracies among the brewers and their respective distributors.

After extensive class action discovery plaintiffs amended their complaint, dismissing more than half of the original defendants (26 distributors and 13 brewers) and adding A–B/Newark as a distributor defendant. On September 25, 1984, I denied plaintiffs' motion for class certification, concluding that the necessity for individualized rule-of-reason analyses as to the vertical territorial restraints and the lack of common proof of antitrust impact precluded class treatment. Plaintiffs subsequently filed a second motion for certification of the same retailer class on purely horizontal

claims against only the A–B and Miller distributors. On March 12, 1985, I granted plaintiffs' second motion for class certification and dismissed all brewer defendants and the remaining distributor defendants which did not sell A–B or Miller beer.

On March 25, 1985, plaintiffs filed their Second Amended Verified Class Action Complaint and Demand for Jury Trial, in which plaintiffs allege:

> The defendants have combined, conspired and agreed among themselves to allocate territories for the distribution of beer in the relevant geographic market, i.e., the State of New Jersey. Defendants' conduct is manifested in a system of "areas of responsibility" or "exclusive territories" by which defendants allocate the distribution of beer in New Jersey. The purpose and effect of said system is that no distributor sells beer outside of that distributor's exclusive territory; no member of the plaintiff class can buy any brand of beer from a distributor other than the exclusive distributor for that brand of beer in the area in which the class member is located.

Plaintiffs' theory encompasses three distinct alleged horizontal conspiracies: 1) a conspiracy among the A–B distributor defendants to allocate territories for the sale of A–B beer; 2) a conspiracy among the Miller distributor defendants to allocate territories for the sale of Miller beer; and 3) a joint conspiracy between the A–B and Miller defendants to allocate A–B and Miller territories.

The complaint alleges that the defendants' conspiracies had the purpose and effect of eliminating intrabrand and interbrand competition among the defendant distributors in the State of New Jersey. The complaint further asserts that defendants' conduct was intended to and has indeed directly and proximately caused the wholesale prices of beer in New Jersey to rise to artificially high levels, and, as a result, members of the plaintiff retailer class have been required to pay higher prices for the beer they have purchased and continue to purchase from the defendant distributors. Plaintiffs seek judgment for, *inter alia:* 1) treble damages, interest, costs of suit and attorneys' fees, and 2) a permanent injunction ordering the termination of any and all geographic market allocation and exclusive territory agreements among the defendants.

### III. LEGAL AND FACTUAL FRAMEWORK

For at least 20 years prior to 1967 A–B/St. Louis assigned specified territories within which each of its New Jersey distributors were authorized to sell A–B malt beverage products. However, in 1967 the Supreme Court held that the vertical imposition of exclusive territories was *per se* illegal. *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Under cases interpreting the scope of the *per se* rule enunciated in *Schwinn,* producers could not insist upon observance of territorial or customer restrictions on resale, but could assign territories within which distributors or retailers were expected to concentrate their primary marketing efforts. *See, Janel Sales Corp. v. Lanvin Parfums, Inc.,* 396 F.2d 398, 406 (2d Cir.), *cert. denied,* 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968); *Colorado Pump & Supply Co. v. Febco, Inc.,* 472 F.2d 637, 639–40 (10th Cir.), *cert. denied,* 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973); *but cf. Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894 (5th Cir.1973).

In 1974, A–B/St. Louis and each of the A–B defendants (and all 950 A–B distributors nationwide) entered into Anheuser–Busch Wholesaler Equity Agreements ("the 1974 A–B Equity Agreements"). The 1974 A–B Equity Agreements assigned each distributor a primary marketing area in which it was responsible for sales, service and merchandizing of A–B products. The first paragraph of the agreements provided:

> AREA OF PRIMARY RESPONSIBILITY:
>
> Wholesaler agrees to exercise its best efforts to promote, sell and service Anheuser-Busch's Products in the geographic area designated on Exhibit 1 as

Wholesaler's primary market area. Wholesaler shall be primarily responsible for servicing retail accounts in its primary market area with Anheuser–Busch Products and will be expected to concentrate its efforts in that area. It is understood, however, that, unless required by state law, Anheuser–Busch does not assign exclusive areas and does not grant exclusivity to Wholesaler in its primary market area.

The agreements specified that each wholesaler was to direct its efforts "to achieve maximum market representation of Anheuser–Busch products in Wholesaler's primary market area." The agreements also required distributors to satisfy certain sales and merchandizing standards. Failure to satisfy these standards in its area of primary responsibility ("APR") was grounds for termination of a distributor's relationship with A–B/St. Louis.

In 1977, the Supreme Court overruled *Schwinn* and held that vertical imposition of exclusive territories is not illegal *per se. Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Under *Sylvania,* the legality of vertical restrictions is evaluated under a rule-of-reason analysis.

In December 1982, A–B/St. Louis entered into new agreements ("the 1982 A–B Equity Agreements") with each of its 950 wholesalers nationwide, including the New Jersey A–B wholesalers. The provisions of these agreements were identical for all A–B distributors (except where the territorial restrictions contained therein were prohibited by state law). Paragraph one of the agreements expressly provides for exclusive territories and states that a distributor is subject to termination if it engages in sales outside its exclusive territory. The 1982 A–B Equity Agreements are still in effect.

Miller began selling beer in New Jersey in the 1940's through existing distributors. Some of these distributors were then serving as distributors for other brewers who had already established territories for their distributors. Miller has assigned specific territories to all its distributors since it began doing business in New Jersey.

Prior to May 1983, Miller's contracts with its various distributors were different, each being entered into at a different time. The contracts of certain distributors allocated to each an "area of primary responsibility", while others specified a "territory." None of the contracts contained specific performance standards, yet each distributor's performance was subject to Miller's review. The contracts either required the generalized "best efforts" of the distributor or required the distributor to actively and aggressively market Miller beer within its defined territory.

Miller had various rights under the contracts to terminate them if the distributor's performance was unsatisfactory. Some were expressly terminable at will at any time, while several others had detailed termination provisions. None of the contracts restricted Miller's right to appoint another distributor in the same defined territory, and a number expressly set forth Miller's right to do so. Some expressly allowed Miller to "at any time, by written notice to Distributor, reduce Distributor's Area."

Miller's contract with defendant Kristen was slightly different from the others. In 1953, Miller and Kristen entered into a written distributorship agreement which provided in pertinent part:

> The Distributor is to (a) sell and promote the sale of Miller High Life and such other of Miller's products as Miller may elect to market in the foregoing territory to the satisfaction of Miller; ... and (g) not sell outside such territory or to other wholesalers without the prior written approval of Miller.

This territorial restriction was augmented by an allocation clause under which Miller was empowered to determine, in its sole discretion, the quantities of beer that it would supply to Kristen.

In May 1983, Miller entered into uniform distributorship agreements with its distributors nationwide, including the nine New Jersey Miller defendants. These agreements identify the distributors' territories as exclusive and prohibit sales outside of

the distributors' designated territories. The agreements are still in effect.

## IV. PRELIMINARY RULINGS

The A–B and Miller defendants each jointly contend that there is no evidence to support plaintiffs' claims regarding a joint A–B/Miller conspiracy. In their papers in opposition to defendants' summary judgment motions, plaintiffs acknowledge that they are not pursuing the joint conspiracy claims, having "concluded that the conspiracies among Anheuser–Busch distributor defendants and among Miller distributor defendants are separate." Accordingly, defendants are entitled to summary judgment on the previously alleged joint A–B/Miller conspiracy claims.

In addition, plaintiffs have not attempted to prove the existence of separate A–B distributor and Miller distributor conspiracies nor calculate damages for the time periods following the contractual imposition of exclusive territories in the 1982 A–B Equity Agreements and the 1983 Miller Distributor Agreements. Plaintiffs effectively concede that the relevant time period with regard to its conspiracy claims against the A–B defendants is February 15, 1979 (i.e., four years prior to the filing of their original complaint) through December 1982, and February 15, 1979 through May 1983 with regard to their claims against the Miller defendants. To the extent that plaintiffs' second amended complaint seeks damages arising from activities of the A–B and Miller defendants after these respective time periods, summary judgment is granted in favor of defendants. Insofar as plaintiffs are no longer claiming that any existing territorial arrangements are illegal, defendants are similarly entitled to summary judgment on plaintiffs' claims for a permanent injunction.

## V. DISCUSSION

Section 1 of the Sherman Act outlaws "[e]very contract, combination ..., or conspiracy, in restraint of trade...." 15 U.S. C. § 1. To recover for a violation of Section 1, plaintiffs have the burden of proving three essential elements: 1) an unlawful conspiracy among defendants in restraint of trade; 2) anticompetitive injury to plaintiffs proximately caused by defendants' illegal conduct; and 3) measurable damages which plaintiffs have sustained. *American Bearing Co. v. Litton Industries,* 729 F.2d 943, 948 (3d Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed. 2d 112 (1984). Defendants move for summary judgment on each of the above elements.

### A. Proof of Conspiracy

On its face, § 1 of the Sherman Act appears to bar any commercial agreement so long as it is "in restraint of trade." However, it has long been established that courts will not enforce the literal terms of § 1:

> "[R]estraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law.

*National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). In lieu of the narrowest reading of § 1, the Supreme Court early on adopted a "rule-of-reason" analysis under which challenged business relationships are evaluated to determine whether they are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). Over time, the Supreme Court has identified certain "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). As the Supreme Court stated in *United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972);

> One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.

Plaintiffs allege that the A–B defendants and Miller defendants separately conspired to enter just such agreements.

There are certain unique factual and analytical idiosyncrasies which distinguish this case from others brought under § 1 of the Sherman Act. Antitrust conspiracy cases typically require a determination as to whether the challenged business conduct resulted from an illegal horizontal agreement or from the independent business judgment of the defendants. *See e.g., First National Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Theatre Enterprises v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). It is axiomatic that "Section 1 of the Sherman Act prohibits only joint action; independent business decisions and actions cannot be the basis of a section 1 claim." *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 207 (3d Cir.1980). In the present case defendants posit a third alternative explanation for their challenged conduct. The A–B defendants do not dispute that they did not compete with other wholesalers of the same brand of beer for retail accounts during the relevant damage periods. Indeed, it is agreed that there was a total absence of intrabrand competition among the A–B defendants wholesalers during the pertinent period. The A–B defendants contend that they confined their sales to their respective APRs or otherwise refrained from intrabrand competition with other wholesalers out of compliance with the corporate policies of A–B/St. Louis. While the Miller defendants do not concede the absence of intrabrand competition among New Jersey distributors of Miller beer products, they similarly assert that to the extent they did refrain from engaging in sales outside their APRs they did so in response to vertical direction from Miller.

Defendants assert that as early as the 1940's and continuing through to the present both Miller and A–B/St. Louis had strong corporate policies that their distributors not sell beer outside their assigned territories; that prior to the *Schwinn* decision the brewers vertically imposed exclusive territories on distributors of their beer nationwide; that after the *Schwinn* decision the brewers continued to emphasize to their distributors the importance of confining sales to their assigned territories; that the language of the agreements between the brewers and defendant wholesalers in effect prior to execution of the 1982 A–B Equity Agreements and the 1983 Miller Distributor Agreements reflected the continuing policy and expectation of the brewers that defendants confine their sales efforts to their assigned territories; and that defendants were fully aware of the brewers policies and expectations regarding out-of-territory sales. Defendants further contend that maintaining good relations with the brewers was critical to the long-term survival and success of the distributors' businesses; that with the exception of defendant Warren, whose sales of Miller beer represented approximately 50% of its total sales between 1979 and 1982, sales of either A–B or Miller beer products represented the vast majority (80% or more) of the sales of each of the defendant distributors; and that in addition to being defendants' major suppliers of beer, the brewers provided defendants with other substantial assistance which was important to the success of the defendants' businesses, including the extension of credit, assistance and instruction in marketing and merchandizing the brewers' products, and the allocation of point of sale materials such as clocks and neon signs. Defendants additionally assert that the very existence of the distributors as viable entities depended upon the brewers' continued favorable evaluation of the distributors' performance; that the brewers evaluated the performance of their distributors solely on the basis of the distributors' efforts within their assigned territories; that either A–B/St. Louis or Miller could terminate its relationship with a distributor if, in the brewer's judgment, the distributor was failing to satisfy its sales, servicing and promotional obligations within its assigned territory; and that the brewers could take other unilateral actions against a distributor, short of termination, for failing to adhere to the brewers' corporate policies and performance standards.

Their actions, defendants contend, could effectively destroy a distributor's business, including withholding credit, restricting a distributor's allocation of beer, and/or appointing another distributor to service an existing distributor's territory. Lastly, defendants assert that each distributor had enormous investments in time, money and goodwill in being an A–B or Miller distributor; that each distributor understood that its long-term relationship with either A–B/St. Louis or Miller could be jeopardized by engaging in out-of-territory sales in contravention of the brewer's corporate policy; and that each distributor made a separate and independent business judgment that the short-term profits, if any, to be derived from out-of-territory sales were not worth the risk of losing its franchise to sell Miller or A–B beer. In short, defendants contend that restraints on intrabrand competition were the result of vertical direction from A–B/St. Louis and Miller, and not, as plaintiffs allege, the result of separate horizontal agreements between the A–B distributor defendants and the Miller distributor defendants.

As previously noted, plaintiffs abandoned their claims of unlawful vertical conspiracies between individual brewers and their respective distributors following the September 25, 1984 opinion denying plaintiffs' first motion for class certification. Therefore, the legality of vertical restraints on intrabrand competition is no longer an issue in this case. To the extent that there existed such brewer-initiated vertical restraints, no conclusions can be drawn with regard to the reasonableness of these restraints. Indeed, absent a finding that vertical restraints on intrabrand competition at the wholesale level are unreasonably restrictive of competitive conditions, any such restraints must be presumed lawful for purposes of the present motions.[1] Thus, in opposing defendants' motions for summary judgment, plaintiffs are placed in the ironic position of challenging the existence of vertical restraints on competition which had been the centerpiece of their antitrust allegations in the original complaint.

In order to prevail on their motions for summary judgment, defendants must establish that "there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court stated in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986):

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

In order to satisfy their initial burden under Rule 56(c) in a case involving claims of illegal conspiracy under § 1 of the Sherman Act, it may be sufficient for defendants to present evidence reflecting their denial of the existence of or complicity in the alleged conspiracy and setting forth an innocent explanation of the challenged conduct. *See e.g., Kreuzer v. Am. Academy of Periodontology*, 735 F.2d 1479, 1488 (D.C.Cir.1984).

In their moving papers, defendants have established beyond dispute that A–B/St. Louis and Miller assigned territories to their New Jersey distributors and that the distributors largely confined their sales to retail accounts within these territories. Officers of A–B/St. Louis and Miller testified in depositions that A–B/St. Louis and Mil-

---

1. In rejecting the *per se* rule of *Schwinn* and reverting to a rule-of-reason analysis of vertical restrictions on competition, the *Sylvania* Court acknowledged that such restrictions can have procompetitive effects:

> Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products.

433 U.S. at 54, 97 S.Ct. at 2559. In *Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311 (8th Cir.1986), the court upheld the validity of the vertical territorial assignments contained in the 1983 Miller Distributor Agreements under a rule-of-reason analysis.

ler had strong corporate policies favoring the exclusivity of the territories assigned to their respective distributors and that they communicated these policies to their distributors. Defendants have each categorically denied that they were party to or knew of any agreement among A–B or Miller distributors respecting the allocation of exclusive territories. Principals and/or officers of the A–B and Miller distributor defendants have uniformly stated under oath in depositions or certified in answers to interrogatories that they were aware of the A–B or Miller policies against out-of-territory sales, and limited sales to their respective territories, to the extent that they did, because they did not want to jeopardize their relationship with the brewers. This evidence satisfies the initial burden placed on moving parties under Rule 56(c).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In the antitrust context, a plaintiff opposing a summary judgment motion must set forth specific facts showing a genuine issue of material fact as to whether defendants entered into an illegal conspiracy. *Id.* "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Id.* at 1357, *quoting from United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the *Matsushita* Court explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no 'genuine issue for trial.' " 106 S.Ct. at 1356.

■ Plaintiffs in this case have presented no direct evidence of a horizontal conspiracy among the A–B defendants or the Miller defendants to restrain intrabrand competition. That is, there is no evidence of meetings, telephone calls or correspondence among the A–B or Miller defendants during or in which they discussed the allocation of exclusive territories.

In the absence of direct evidence of agreement among the defendants, a conspiracy can be established by circumstantial evidence sufficient to permit an inference of agreement.[2] *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939). As the Third Circuit explained in *Milgram v. Loew's, Inc.*, 192 F.2d 579, 583 (3d Cir. 1951):

> [I]n this modern era of increasing subtleties, it is rare indeed for a conspiracy to be proved by direct evidence. There is no dispute over the proposition that circumstantial evidence will sustain a finding of conspiracy.

There are, however, legal limits on the inferences which may be drawn from circumstantial evidence; "limits beyond which reasonable inference-drawing degenerates into groundless speculation." *In re Japanese Electronic Products*, 723 F.2d 238, 304 (3d Cir.1983), *rev'd on other grounds, Matsushita, supra.*

The Supreme Court in *Matsushita* specifically cautioned that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." 106 S.Ct. at 1357. In particular, the Court stated that evidence of "conduct as consistent with permissible competition as with illegal conspiracy does not, without more, support

2. In most contexts, attempts to distinguish between so-called direct and circumstantial evidence result in essentially arbitrary classifications. All evidence falls somewhere along a continuum between the irrelevant and the conclusive. Some evidence is simply more probative of a particular matter to be proved than other evidence. The distinction between direct and circumstantial evidence in antitrust law, however, has taken on a particularized mean-

ing. Therefore, for purposes of the present motions, references to direct evidence relate to oral or written communications in which defendants expressly discussed the creation or maintenance of exclusive territories. References to circumstantial or indirect evidence relate to all other evidence which tends to either prove or disprove the existence of such a horizontal conspiracy.

even an inference of conspiracy." *Id.* at 1362, n. 21; *see also, Id.* at 1357. Such evidence lacks any tendency to make the existence of the ultimate fact in issue (i.e., a horizontal conspiracy) more probable, and therefore does not give rise to a 'genuine issue for trial.'

The Supreme Court decision in *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) is instructive on this point. In *Cities Service* the plaintiff alleged that a number of oil company defendants had conspired to boycott the purchase of Iranian crude oil through him. Defendant Cities Service initially had negotiated with the plaintiff but ultimately purchased no oil through him despite the favorable terms of his offer. In opposition to a motion by Cities Service for summary judgment, plaintiff argued that the failure of Cities Service to purchase Iranian oil through him despite his attractive offer supported a reasonable inference of participation in a conspiracy sufficient to raise a question of fact for trial. The Supreme Court affirmed summary judgment against the plaintiff holding that

> not only is the inference that Cities' failure to deal was the product of factors other than conspiracy at least equal to the inference that it was due to conspiracy, thus negating the probative force of the evidence showing such a failure, but the former inference is more probable.

391 U.S. at 280, 88 S.Ct. at 1588.

In *Matsushita,* the Court further articulated the quality of evidence necessary to support a reasonable inference of conspiracy:

> To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.

106 S.Ct. at 1357, *quoting from Monsanto Co. v. Spray Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). This does not mean, as the Miller defendants argue, that the district court should usurp the function of the jury by determining on summary judgment whether the inference of conspiracy is more probable than not. Rather, the court must examine the totality of the circumstantial evidence to determine whether there is sufficient unambiguous evidence from which a rational jury could make such a finding without resorting to rank speculation. *See e.g., Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 116 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

■ Applying the *Matsushita* standard to the facts in this case is particularly problematic. The central issue in this case is whether restraints on intrabrand competition resulted from vertical direction from the brewers or horizontal agreement among defendant distributors of the A–B or Miller brands. The existence of vertical restraints on intrabrand competition among New Jersey beer wholesalers does not necessarily exclude the possibility that illegal horizontal restraints were simultaneously operating to restrict such competition. Restraints on intrabrand competition might plausibly be the result of both vertical direction from the brewers and horizontal agreement among the distributors. However, under the *Matsushita* summary judgment standard, plaintiffs have the burden of presenting a minimum quantum of unambiguous circumstantial evidence from which a jury could reasonably infer that the conduct which forms the basis of plaintiffs' § 1 claim (that is, the decision of A–B and Miller wholesalers to refrain from intrabrand competition in New Jersey) resulted from horizontal agreement among the wholesalers and not from independent business judgments on the part of each distributor to abide by the corporate policy of A–B/St. Louis or Miller. In other words, plaintiffs must present evidence which favors the inference that defendants were acting in conformity with a horizontal conspiracy not to compete and "tends to exclude the possibility" that they were merely responding to the vertical direction of the brewers. *Matsushita, supra,* 106 S.Ct. at 1357. Evidence of conduct which is equally consistent with brewer-initiated vertical restraints as with an illegal hori-

zontal conspiracy will not suffice to create a triable issue for a jury. *Id.*

■ In lieu of direct evidence of conspiracy, plaintiffs rely on circumstantial evidence of consciously parallel business behavior to establish the existence of horizontal agreements among the A–B defendants and the Miller defendants. As the Supreme Court noted in *Theatre Enterprises,* "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement." 346 U.S. at 540, 74 S.Ct. at 259. Under the theory of conscious parallelism, a plaintiff must show 1) that the defendants' business behavior was parallel, and 2) that the defendants were conscious of each other's conduct and that awareness was an element in their decisional process. *Schoenkopf,* 637 F.2d at 208.

■ While having some tendency suggestive of concert of action, consciously parallel conduct standing alone is insufficient circumstantial evidence from which to infer an antitrust violation. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Before such an inference may be drawn a plaintiff must also show 1) that the defendants acted in contradiction of their economic interests, and 2) that the defendants had a common motive to enter into an agreement. *Venzie Corp. v. United States Mineral Products Co., Inc.,* 521 F.2d 1309, 1314 (3d Cir.1975). Furthermore, in order to survive a summary judgment motion under the standard articulated in *Matsushita, supra,* the circumstantial evidence offered by plaintiffs to satisfy the above four elements of proof must "make the inference of rational, independent choice less attractive than that of concerted action." *Bogosian,* 561 F.2d at 446.

### 1. Circumstantial Evidence of an A–B Distributor Conspiracy [3]

#### a. *Parallel Conduct*

■ There is no dispute that the A–B defendants made virtually no sales of A–B beer outside their brewer-assigned APRs during the relevant period. Indeed, there is no evidence that A–B/Newark, Crown or Harrison ever sold A–B beer outside of their respective APRs. Certainly, to the extent that defendants confined their sales to the territories assigned to them by A–B/St. Louis, this parallel conduct is perfectly consistent with the inference that restraints on intrabrand competition were vertically directed.

Plaintiffs cite evidence of certain isolated instances in which particular A–B distributors sold A–B beer outside their APRs, and argue that this evidence supports the inference that territories were established by horizontal agreement among the wholesalers and not by vertical direction from the brewers. Plaintiffs have presented evidence of only three such instances.

Plaintiffs note that High Grade sold A–B beer to a retail account known as Witty's Rahway during the entire period covered by its 1974 Equity Agreement with A–B/St. Louis notwithstanding the fact that Witty's Rahway was located in the APR of A–B/Newark. Plaintiffs argue that High Grade's out-of-territory sales to Witty's Rahway and A–B/Newark's acquiescence in these sales demonstrate that the wholesalers were allocating retail accounts among themselves in apparent disregard of the brewer-assigned territories. The record, however, does not support such a conclusion. High Grade began selling to Witty's Rahway as an apparent accommodation to its then owner who also owned two other retail stores within High Grade's APR and who derived the benefit of quanti-

---

**3.** In support of their conspiracy claims, plaintiffs rely extensively on deposition testimony of the defendants relating to the conduct of individual distributors. Before statements of alleged coconspirators may be admitted against other purported members of the conspiracy, plaintiffs must establish by a preponderance of independently admissible evidence the existence of the conspiracy and that each party against

whom the statements are offered was a member of it. *See In re Japanese Electronic Products,* 723 F.2d 238, 260–263 (3d Cir.1983), *rev'd on other grounds, Matsushita, supra.* At the hearing on the present summary judgment motions, plaintiffs' counsel made a proffer as to the independent evidence plaintiffs will rely on to establish the participation of each defendant in the alleged horizontal conspiracies.

ty discounts by purchasing A–B beer for all three establishments from one wholesaler. These facts simply are not suggestive of a conspiracy among A–B wholesalers to allocate exclusive territories.

Plaintiffs also cite evidence that Konrad serviced 17 retail accounts along Route 73 in Mt. Laurel Township in southern Burlington County which were located in the APR assigned to Ritchie & Page in its 1974 Equity Agreement with A–B/St. Louis. In 1975, Ritchie & Page inquired of A–B/St. Louis as to whether it should service two new accounts in this area. Apparently, Ritchie & Page did not challenge Konrad's right to sell A–B beer to the 15 other accounts that Konrad was already servicing in the area. In a letter to Konrad and Ritchie & Page dated April 30, 1975, A–B/St. Louis stated that "we have no right, nor do we assume the right to settle your area dispute." Plaintiffs contend that this language confirms that exclusive territories were not vertically directed. A careful reading of the entire letter, however, belies this contention.

The April 30, 1975 letter is clearly crafted to avoid the appearance of imposing exclusive territories on its distributors in violation of the antitrust standard set forth in the *Schwinn* decision. The final paragraph of the letter reminds the distributors that "the law does not allow exclusivity, and Anheuser–Busch, Incorporated cannot and will not undertake any action which could be interpreted as advocating exclusivity." Nevertheless, in preceding passages A–B/St. Louis notes that Konrad had been "servicing the area for a number of years" and expressed its satisfaction with the existing situation. The letter further states that A–B/St. Louis was prepared to delete the area from the APR of Ritchie & Page and add it to the APR of Konrad. Thus, while A–B/St. Louis purportedly refused to settle the "area dispute", its preference for maintaining the status quo was unequivocally communicated to the distributors. Furthermore, the very fact that Ritchie & Page appealed to A–B/St. Louis for a clarification of wholesaler territories undermines plaintiffs' claim of a horizontal conspiracy. If retail accounts were being allo-

cated by agreement among the wholesalers, there would be no reason for any wholesaler to seek such a clarification from the brewer.

Plaintiffs further rely on evidence that Ritchie & Page serviced at least one active retail account in Allentown, New Jersey during the entire period of its 1974 Equity Agreement with A–B/St. Louis. Richard Woodruff, New Jersey District Manager for A–B/St. Louis, acknowledged in deposition testimony that during this period Allentown was situated in the APR of Crown.

Evidence that certain A–B wholesalers sold A–B products to retail accounts outside their brewer-assigned APRs without objection from the distributors in whose APRs these accounts were located has some tendency suggestive or horizontal agreement among the wholesalers. However, the probative force of the evidence presented by plaintiffs of such extra-territorial sales by A–B wholesalers is extraordinarily weak. This evidence reflects out-of-territory sales to no more than 20 of approximately 12,000 retail accounts in New Jersey. The majority of these accounts are located near the boundaries of the brewer-assigned wholesaler territories. The A–B defendants point out that A–B/St. Louis designated wholesaler APRs by cutting up a map of New Jersey and appending these map cut-outs as an exhibit to its 1974 and 1982 Equity Agreements with each New Jersey distributor. These cut-outs do not clearly delineate each municipality, street or highway situated in each distributor's territory. Thus, the fact that several wholesalers historically serviced a small number of retail accounts located along the boundary of their map areas which actually fell within the adjoining territory of another wholesaler can reasonably be attributed to the imprecision of the method by which A–B/St. Louis designated wholesaler territories. For example, in the 1982 Equity Agreement between A–B/St. Louis and Ritchie & Page the map cut-out of the distributor's APR included the town of Allentown but the map had been cut in such a way as to exclude the name of the town. In a letter to A–B/St. Louis dated

September 28, 1982, Ritchie & Page sought to clarify that it had serviced the Allentown area since prior to 1963 and that the two accounts in that town were within its territory.

As further evidence of defendants' parallel business conduct arising out of the alleged horizontal conspiracy, plaintiffs cite to phone conversations between Louis Natale of Ritchie & Page and Herb Konrad of Konrad and other of the A–B defendants during the summer of 1982 relating to the sale of A–B beer in New Jersey by International Beverage Company ("International Beverage"). International Beverage was a so-called "transshipper" which obtained A–B and other brands of beer from sources in the State of New York and "transshipped" them to retailers located throughout New Jersey at prices lower than those of the defendants. Plaintiffs assert that Natale and Konrad made these calls "to express their displeasure at discounted sales which they feared would cut into their monopoly prices." The record does not support this assertion.

Although Mr. Konrad acknowledged in deposition testimony that he was personally concerned that sales of A–B beer by International Beverage might cut into Konrad's sales, neither Mr. Konrad nor Mr. Natale recalled discussing International Beverages prices in their phone conversations with other A–B wholesalers. It is apparent from his deposition testimony that Mr. Konrad was concerned that International Beverage was not a brewer-authorized distributor of A–B beer and was therefor operating in violation of New Jersey alcoholic beverage law. In fact, Mr. Konrad testified that prior to contacting other wholesalers he called the Director of the New Jersey Division of Alcohol Beverage Control ("ABC") to report International Beverage's activities. According to Mr. Konrad, the ABC held hearings on the matter, and subsequently directed International Beverage to discontinue its sales of A–B beer in New Jersey. Mr. Natale testified that in his phone conversations with other A–B wholesalers he merely expressed his concern that International Beverage's sales might compromise the product quality of

the A–B brand in New Jersey. Concern over the legality of International Beverage's activities and concern over the maintenance of A–B product quality are undeniably legitimate subjects of communication among the A–B defendants. At best, the evidence of phone conversations between the A–B defendants merely demonstrates an opportunity for formation of an unlawful conspiracy. Such evidence standing alone is insufficient to defeat summary judgment. *Venzie*, 521 F.2d at 1313. Furthermore, as the Third Circuit noted in *Venzie:*

> While the jury [would be] free to disregard the defendants' testimony that no agreement of any kind was formulated during the course of these contacts, mere disbelief could not rise to the level of positive proof of agreement to sustain plaintiffs' burden of proving conspiracy.

*Id.*

b. *Knowledge of Parallel Conduct*

■ There is no dispute that each of the A–B defendants knew that the other A–B wholesalers in the state were limiting sales to particular territories. They were each familiar with the boundaries of neighboring territories, aware that they had none of the same customers for A–B beer as any other A–B wholesaler, and fully expected that the other A–B wholesalers would not attempt to compete for customers within another wholesaler's territory. Defendants concede these facts and rightly observe that the same facts would be present whether the wholesalers were agreeing among themselves to restrict intrabrand competition or were merely abiding by the policy of A–B/St. Louis against extra-territorial sales.

Plaintiffs also cite evidence that defendants' business decisions were based on their knowledge that each A–B wholesaler would confine its sales of A–B products to particular territories. Plaintiffs note that the A–B defendants routinely exchanged beer among themselves at cost if one wholesaler did not have sufficient beer to meet retailer demand and another wholesaler had excess inventory to spare. Plain-

tiffs argue that a wholesaler would be unwilling to provide another wholesaler with beer at cost unless it was secure in the knowledge that the wholesaler to whom it gave the beer would not turn around and resell the beer to retailers in the territory of the wholesaler supplying the beer.

Plaintiffs further cite conversations between High Grade and other A–B wholesalers regarding High Grade's so-called "convenience sales" to retailers outside its APR when other distributors were closed for business or were otherwise unable to service the accounts. Mr. De Marco of High Grade testified that High Grade would attempt to contact the wholesalers in whose territories the retailers were located prior to or soon after making such sales. Plaintiffs argue that the implied purpose of these calls was to seek permission to make the sales or to disclaim any intent to invade the neighboring wholesaler's territory, and that such calls would only be necessary if High Grade were party to a horizontal agreement to honor the exclusive territories of neighboring wholesalers. This argument, however, finds no support in the record. In fact, Mr. De Marco unequivocally testified that the purpose of the calls was to inform the neighboring distributor that a retailer in its territory was experiencing an inventory shortage.

While evidence of the exchange of beer at cost among the A–B defendants and High Grade's convenience sales to retailers outside its APR tends to show that the A–B defendants recognized and respected the exclusivity of each other's territories, this conduct does not favor the inference of a horizontal conspiracy. Cooperation of this sort among A–B wholesalers for the purpose of assuring that retailers receive an uninterrupted supply of A–B beer is certainly in the interest of the brewer and is entirely consistent with a brewer-directed system of restraints on intrabrand competition. It may be true, as plaintiffs argue, that this level of cooperation among distributors would not exist in an unrestricted competitive environment. In such an environment a business enterprise might be expected to act decisively to exploit the inability of a competitor to ade-

quately service its customers. This truism, however, does not advance plaintiffs' position. As previously stated, the question in this case is not whether defendants were operating in a truly competitive manner. Defendants concede the absence of competition among distributors of A–B beer, and evidence relating to the exchange of beer at cost and extra-territorial convenience sales merely highlights this admitted fact.

In sum, plaintiffs' evidence of defendants' parallel business conduct succeeds only in proving that which is uncontested. Plaintiffs have established that the A–B defendants uniformly and consciously refrained from competing among themselves for retail accounts. However, evidence of this parallel business behavior does nothing to assist plaintiffs in satisfying their burden under *Matsushita.*

### c. *Conduct Against Economic Self-interest*

In a competitive business environment, a business enterprise is presumed always to act to further its self-interest. It logically follows that business behavior which is contrary to self-interest would be rational only if business entities which would otherwise be in competition with one another act in a similar manner. Thus, parallel action by putative competitors in apparent contradiction of their individual self-interest strengthens the inference of conspiracy. *See, generally,* Areeda, *Antitrust Law* ¶ 1415 (1986).

As evidence of conduct by the A–B defendants which was contrary to their individual self-interest, plaintiffs cite the distributors' refusal to make sales to retail accounts located outside their respective APRs when such sales would have required no incremental cost to the distributors or when the delivery costs of making such sales would have been no higher than the cost of sales to retail accounts within their APRs. In particular, plaintiffs note that four of the six A–B defendants (excluding Crown and A–B/Newark) engaged in the practice of "selective sales abstention" whereby the distributor would sell some brands of beer to certain retailers outside

their A–B territories, yet refuse to sell A–B brands to the same retailers, even though the A–B brands were on the distributors' trucks when they were delivering the other brands. Under these circumstances, the sale of A–B brands to these retailers would have entailed no additional delivery costs to the distributors. Similarly, the fact that these four A–B distributors travelled beyond the boundary of their respective A–B territories to deliver other brands of beer demonstrates that the distance for profitably selling A–B brands extended beyond the A–B/St. Louis-assigned APRs. Plaintiffs also note that due to the irregular shape of the A–B territories there was substantial economic incentive for the A–B defendants to sell outside their APRs in areas that were closer to their warehouses than areas within their APRs. Furthermore, the existence of price differences among the various A–B defendants provided an even greater incentive for lower priced distributors to cross into the territories of higher priced distributors in order to increase sales. In addition, plaintiffs contend that the refusal by certain defendants to sell A–B brands to members of retail buying cooperatives ("co-ops") located outside their APRs even though the co-op drop site was within their APR and the practice of selling beer at cost to distributors with inventory shortages rather than taking advantage of their inability to service their retail customers by selling at a profit directly to the customers is further evidence of conduct which was contrary to the defendants' economic self-interest.

Plaintiffs assert that the refusal of defendants to sell A–B beer outside their A–B territories cannot be justified by inventory or capacity problems insofar as most of the defendants admit that they either had excess capacity during portions of the relevant time period or had in the past expanded their operations to meet any increase in sales they could obtain. In sum, plaintiffs charge that the failure of the A–B defendants to take advantage of profitable sales opportunities outside their APRs was demonstrably contrary to their self-interest and would be economically rational only if they had agreed among themselves to uni-

formly refrain from engaging in such extra-territorial sales.

While conceding that they could have derived short-term profits from certain sales of A–B brands outside their respective APRs, the A–B defendants insist that their refusal to engage in such sales is entirely consistent with their long-term economic interests. In particular, the A–B defendants contend that they would have risked losing their franchise to sell A–B beer by contravening the brewer's corporate policy against extra-territorial sales. Thus, their interest in maintaining a long-term relationship with A–B/St. Louis was of greater economic importance to them than any short-term profit they might have derived from sales of A–B beer outside of their respective territories. As Leonard Hollander of Harrison testified:

> I was restricted to stay in my marketing area and put all my efforts, all my promotions, all my merchandising within that area. Anheuser–Busch felt very strongly about a wholesaler taking care of his marketing area, or he could be— even though the sales were up, if you did not do the merchandising, servicing the customers, selling, you were subject to be relieved as a wholesaler. And I, for one, was not going to test it.

Ralph Rapisardi of Crown similarly stated by way of affidavit:

> That practice [of limiting sales to the brewer-assigned territory] is strictly rooted in obedience to A–B corporate policy and sound business and marketing policy. There is no doubt in my mind that if Crown or any other distributor did not adhere to the directives of A–B or deviate[d] from the corporate policy of distributing beer only within assigned geographic territories, that distributor would risk losing its distributorship. The investment in an A–B distributorship is very substantial. I have never, and would never take the chance of losing my distributorship by selling outside my territory ... in complete disregard of the corporate policy of A–B which I have known since 1948.

Courts and commentators alike have concluded that evidence that defendants have merely forgone profitable business opportunities does not satisfy the required showing of conduct against self-interest when defendants have offered sound business reasons for their conduct. In *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 895 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), the Third Circuit stated:

> A business's refusal to enter a transaction, even a transaction with potential for a substantial profit, cannot support an inference that it acted in contradiction of its own economic interests in the face of substantial unrebutted and unimpeached evidence that its refusal was consistent with its own best interests.

*See also, Venzie*, 521 F.2d at 1314–15. In his treatise on antitrust law, Prof. Areeda cautions that courts "must not characterize a firm's sacrifice of short-run interest in favor of long-run interest as contrary to its self-interest." Areeda, *supra*, at ¶ 1415e. Of particular relevance to this case, Prof. Areeda highlights "the possibility that one might refrain from taking an otherwise profitable step because someone else has the power to make it unacceptably costly ... Because the pain that another party can inflict exceeds the gain from doing what the actor would otherwise like to do, inaction serves his self-interest." *Id.* at ¶ 1415f; *see also, Cities Service*, 391 U.S. at 278–79, 88 S.Ct. at 1587.

Plaintiffs argue that the A–B defendants' claim that their long-term economic interests were best served by complying with the policy of A–B/St. Louis favoring territorial exclusivity finds no evidentiary support in the record and merely serves as a pretext for an illegal horizontal conspiracy. There is no question that an antitrust defendant's assertion that its conduct was intended to advance its own economic interests without regard to whether its competitors acted in a similar manner should not be accepted on faith. *See e.g., Milgram*, 192 F.2d at 584–85. Prof. Areeda notes that "[i]f the defendant thought that his behavior served his own interests without regard to the behavior of others, the tribu-

nal has a complete explanation for his conduct and thus no occasion to search for the other explanation of conspiracy." However, he is quick to point out that the self-interest issue does not turn on self-serving statements of a defendant's professed state of mind. "Of course, an incredible claim of self-interest need not be believed." Areeda, *supra.* at ¶ 1415b.

The credibility of a defendant's claim of self-interest largely depends on the factual circumstances which gave rise to the challenged conduct. In practice those courts which have rejected conspiracy claims in part because the challenged conduct was consistent with a defendant's independent economic interests have required at least some factual basis to support this conclusion. *See, Cities Service*, 391 U.S. at 278–79, 88 S.Ct. at 1587; *Tose*, 648 F.2d at 894–95. As a general rule, a conclusion that challenged conduct is the product not of a conspiracy but of an independent business decision consistent with a defendant's economic self-interest is fully warranted if the conduct in question appears to be a reasonable or rational response to a particular business situation or market condition.

In the present case, the validity or rationality of the independent business reason for their conduct proffered by the A–B defendants depends in large measure on the quality of evidence relating to three critical questions: 1) Did A–B/St. Louis have a corporate policy against sales by distributors of its beer outside their assigned APRs; 2) How effectively was this policy communicated to the A–B defendants, and 3) Was the defendants' purported fear of brewer sanctions for deviating from this policy justified under the circumstances?

There is no dispute that from the time it first began selling its products in New Jersey A–B/St. Louis has assigned specific sales territories to its New Jersey distributors. As will be developed below, the record firmly establishes that A–B/St. Louis has long maintained a corporate policy favoring the exclusivity of these territories. August A. Busch, III, Chairman and Chief Executive Officer of A–B/St. Louis,

and Richard H. Woodruff, A–B/St. Louis' District Manager for New Jersey, each testified as to the precise nature of this policy and the importance of this policy to the brewer. In further support of their present joint summary judgment motion, the A–B defendants have submitted the affidavits of Ralph J. Rapisardi, President and General Manager of Crown, and Bernard F. McGarry, Sales Manager of Harrison, and the certification of Thomas J. Ryan, Chief Executive Officer of Ritchie & Page. Each of these individuals had been employed by A–B/St. Louis for many years prior to becoming affiliated with the distributors they now represent. At various times, they had each held key managerial positions with A–B/St. Louis in which they were responsible for monitoring the wholesale distribution and sales practices of distributors of A–B products in certain state, division, regional and/or national markets, and through which they each became intimately familiar with the overall marketing philosophy of A–B/St. Louis and its policy regarding the territories it designated to its distributors. Each categorically asserts in his affidavit or certification that the company policy of A–B/St. Louis was that each A–B distributor should stay within its assigned territory and concentrate its efforts on maximizing the sale of A–B brands to retail accounts in that geographic area.

The long-standing nature of this policy is reflected in letters from A–B/St. Louis received by Harrison in 1956 when Harrison first became an A–B distributor and again in 1958 when it was assigned additional territory by A–B/St. Louis. Attached to each letter was a map which the letters described as "outlining exactly the territory you will service with Anheuser–Busch products." Dr. John Jordan, one of the economic experts retained by plaintiffs, acknowledged in deposition testimony that in this context "exactly" meant "just what the territory is." no more and no less. The territory assigned to Harrison has not changed since 1958, and there is no evidence that Harrison ever sold A–B products outside the territory assigned to it by A–B/St. Louis.

The existence of an A–B/St. Louis corporate policy favoring the exclusivity of distributor territories is most strikingly revealed in the marketing practices of A–B/Newark. By virtue of the fact that it was wholly owned and operated by A–B/St. Louis, the operating policies and practices of A–B/Newark were dictated directly by A–B/St. Louis through its Wholesale Operations Division. As employees of A–B/St. Louis, the A–B/Newark management was directed by A–B/St. Louis to adhere to company policy and confine its sales to the marketing area assigned to it by A–B/St. Louis. William Riesenbeck, a former Eastern Region Manager of A–B/St. Louis' Wholesale Operations Division, testified that "[i]t's just a very strong policy of the company, you do not sell outside the territory, period." Raymond Arps, Marketing Manager of A–B/Newark, further explained during his oral deposition:

A: ... it's not my decision to say whether we should have a policy or not. I'm an employee of the company. They have a corporate policy. I adhere to that policy. I don't get paid to make the decisions as to whether we should have that policy or shouldn't have it.

Q: All right. Who does make the policy?

A: The policy is Anheuser–Busch corporate.

Richard Woodruff, who was first hired by A–B/St. Louis in 1948 as a salesman for the predecessor of A–B/Newark, stated by way of affidavit that A–B/Newark has always followed the corporate policy of A–B/St. Louis and sold only within its marketing area. Plaintiffs have offered no evidence to contravert the above statements and testimony regarding the distribution practices of A–B/Newark and its adherence to A–B/St. Louis corporate policy.

In an effort to rebut the evidence offered by the A–B defendants relating to the A–B/St. Louis policy against extraterritorial sales by its distributors, plaintiffs cite to a single sentence drawn from paragraph 1 of

the 1974 A–B Equity Agreements which states that "[i]t is understood ... that ... Anheuser–Busch does not assign exclusive areas and does not grant exclusivity to Wholesalers in its primary market area." Plaintiffs interpret this contractual language as reflecting the absence of a brewer policy favoring exclusivity. However, this interpretation is reasonable only if the balance of the provisions in the agreement are studiously ignored. The 1974 A–B Equity Agreement assigned each distributor a primary marketing area in which it was responsible for sales, service and merchandizing of A–B products. Exhibit 1 of the agreement was a map showing the distributor's assigned territory. Under paragraph 1, the distributor agreed "to exercise its best efforts to promote, sell and service" A–B products in this territory. Paragraph 1 further specified that the distributor "shall be primarily responsible for servicing retail accounts in its primary market area with Anheuser–Busch products and will be expected to concentrate its efforts in that area." Under paragraph 2, the brewer is committed only to supporting the distributor's "efforts to achieve maximum market representation of Anheuser–Busch Products in Wholesaler's primary market area." The agreement also required the distributor to satisfy certain broadly-defined Sales and Merchandizing Standards in its area of primary responsibility. Thus, while the 1974 A–B Equity Agreement does not expressly prohibit the distributor from selling outside its assigned territory, the entire document unmistakably conveys the brewer's desire and expectation that the distributor confine its sales activity to this territory.

Furthermore, the import of the contractual disclaimer of exclusivity relied on by the plaintiffs cannot be fully apprehended without viewing the 1974 A–B Equity Agreements in the context of applicable antitrust law in effect at the time these agreements were executed. The agreements were adopted by A–B/St. Louis when the *Schwinn per se* standard was in effect. Under *Schwinn*, A–B/St. Louis could not contractually impose exclusive sales territories on its distributors. 388

U.S. at 379. However, it could consistent with the narrow interpretation of *Schwinn* adopted by several courts of appeal assign territories within which its distributors would be expected to concentrate their primary marketing efforts, *see e.g., Colorado Pump*, 472 F.2d at 639–40, and arguably could by non-coercive means attempt to encourage and persuade the distributors not to sell outside these territories. The 1974 A–B Equity Agreement appears to reflect a calculated attempt by A–B/St. Louis to advance a strong policy preference for the exclusivity of distributor territories without overstepping the bounds of existing antitrust law.

There is also considerable evidence that A–B/St. Louis actively communicated its policy favoring exclusivity to distributors of its beer nationwide, and that the A–B defendant distributors in particular were fully aware of the brewer's policy.

As an initial matter, the A–B defendants uniformly believed that the 1974 A–B Equity Agreement clearly conveyed the brewer's policy and expectation that the distributors confine sales to their assigned territories. Herbert Konrad of Konrad testified:

> [I]f you look at the total document, the whole document points or focuses on your [area of primary responsibility]. So, ... I came to the conclusion that they did not want me to sell outside my [APR].

Leonard Hollander of Harrison similarly stated that he felt restricted by his equity agreement with A–B/St. Louis to stay in his assigned marketing area and put all his efforts, all his promotions, all his merchandizing within that area. In view of the contractual language emphasizing the importance of maximizing sales within their assigned territories, it was certainly not unreasonable for the A–B defendants to conclude that A–B/St. Louis expected them to confine their sales to these assigned areas.

There is also ample evidence that the policy preference reflected in the 1974 A–B Equity Agreements was reinforced by other oral and written communications. August Busch, III testified:

[W]e would also say to these [New Jersey] wholesalers that Anheuser-Busch would think it would be a very bad practice, and we would frown upon servicing outside primary areas of responsibility.... We could not prevent wholesalers from doing it, ... under the law. But we would certainly strongly advise them not to do it....

A memorandum from Mr. Busch to all A-B distributors dated October 13, 1981 confirmed that A-B/St. Louis was opposed to distributors selling A-B products outside their assigned areas and urged distributors to refrain from such sales. The memorandum further noted that this position had been communicated to the distributors "on a number of occasions in the past."[4] Richard Woodruff also testified that part of his duties as A-B District Manager for New Jersey included communicating to the A-B defendants the policy of A-B/St. Louis concerning areas of primary responsibility. He noted that he did not discuss the subject of extra-territorial sales with the A-B defendants on a regular basis because the distributors were complying with A-B/St. Louis policy and confining their sales to their respective APRs. Nevertheless, he stated that on those occasions when the issue did arise, "I would point out that our position was that we did not wish [the distributor] to sell out of his [area of] primary responsibility, that it was to his best interest to devote all his time and efforts in the area that was outlined by Anheuser-Busch."

Joseph DeMarco of High Grade testified that he interpreted his 1974 agreement with A-B/St. Louis as restricting High Grade from selling A-B products outside its assigned APR.[5] He further stated that his understanding of the 1974 A-B Equity Agreement was repeatedly confirmed by A-B/St. Louis.

[T]hey have always felt and have told us many, many times in many different way[s] and fashions that, as they see it, it would be best for both the brewer, the wholesaler and the entire wholesaler family to maintain their responsibilities and do the job necessary in their particular market.

In particular, DeMarco referred to meetings convened by A-B/St. Louis at various times prior to December 1982 at which management representatives of A-B/St. Louis reiterated the company's policy regarding extra-territorial sales.

4. Plaintiffs argue that this memorandum should be given little if any evidentiary weight insofar as each of the A-B defendants failed to produce this memorandum in response to specific document requests relating to any written communications from A-B/St. Louis regarding territorial restrictions. Plaintiffs contend that their failure to do so casts doubt on whether this memorandum was ever sent to or received by any of the A-B defendants in New Jersey. However, the failure of the A-B defendants to produce this document during discovery demonstrates only that they did not retain the memorandum in their files and does not overcome Busch's testimony that it was sent to all A-B distributors nationwide, as reflected on the memorandum itself.

5. Plaintiffs challenge the credibility of this testimony by DeMarco with evidence of the distribution practices of Rutgers Distributors in New York State. Rutgers is a wholly-owned subsidiary of High Grade. Although Rutgers and High Grade had identical agreements with A-B/St. Louis during the period of 1974 to 1982, Rutgers consistently sold A-B products to Class C licensees in New York outside of its assigned APR. Plaintiffs argue that Rutgers' willingness to engage in extra-territorial sales effectively undermines DeMarco's professed interpretation of the 1974 A-B Equity Agreements as prohibiting such sales.

The A-B defendants contend that the beer distribution system in New York is dramatically different from that in New Jersey and most other states. According to the A-B defendants, Class C licensees in New York act as independent or "gypsy" beer distributors. They have no contract with A-B/St. Louis and purchase beer in large quantities from regular distributors at reduced prices for resale to retailers or consumers wherever they please. The A-B defendants assert that such distributors comprise a fourth tier in the beer distribution chain in New York for which there is no analogue in New Jersey.

Rutgers' sales of A-B brands to Class C licensees in New York appear to have no relevance to the subject of this lawsuit. This case pertains to the origin of territorial restraints on the wholesale distribution of A-B products *to retail accounts*. There is no evidence that Rutgers ever sold A-B beer to retail accounts located outside its assigned APR. Thus, in this critical respect, there is no evidence that Rutgers' conduct was inconsistent with that of High Grade.

In those meetings it was indicated quite often by the top brass to stay within your [area of] primary responsibility and assume your responsibilities in that area and do the type of job necessary through your marketing sales efforts.

There is evidence that sales personnel at A–B/Newark were instructed in even more direct terms to confine sales to the marketing area assigned by the brewer. Raymond Arps testified that when he was first employed by A–B/St. Louis as sales manager at A–B/Newark in March 1982, he was told by his immediate supervisor that A–B/Newark was prohibited by A–B/St. Louis from selling A–B products outside its marketing area.

In contrast to the considerable evidence showing the existence of an A–B/St. Louis policy against extra-territorial sales and the A–B defendants' awareness of this policy, plaintiffs' evidence offered in support of their contention that A–B/St. Louis "did not care whether [its] distributors were selling outside their [APRs]" is extremely thin. For example, plaintiffs note that representatives of Ritchie & Page, Crown and Konrad each testified that they were not told by A–B/St. Louis prior to December 1982 that they were not permitted to sell outside their territories, or that A–B/St. Louis did not want them to do so. In particular, plaintiffs highlight the following testimony of Ralph Rapisardi of Crown:

Q: During that time period, 1979 to 1982, did anyone from Anheuser–Busch tell you or suggest to you that you were not permitted to sell outside your Anheuser–Busch APR?

A: No.

\* \* \* \* \* \*

Q: Okay. During that time period, 1979 to the end of 1982, did anyone from Anheuser–Busch tell you that Anheuser–Busch didn't want you to sell beer outside of your Anheuser–Busch area of primary responsibility?

A: No.

\* \* \* \* \* \*

Q: During the time period 1979 to 1982 did anyone from Anheuser–Busch tell you that it would be a good idea for you not to sell beer to retailers outside your Anheuser–Busch APR?

A: No.

However, as previously noted, Rapisardi was employed by A–B/St. Louis between 1948 and 1969 in various sales, supervisory and managerial positions. He has stated and plaintiffs do not dispute that during this extensive period of employment he became intimately familiar with the brewer's policy regarding out-of-territory sales by distributors of its beer. Furthermore, there is no evidence that Crown ever sold A–B products outside its assigned territory. There was therefor no apparent reason for A–B/St. Louis to expressly remind Rapisardi during the period of 1979 through 1982 of the company's policy. Similarly, Thomas Ryan of Ritchie & Page was employed by A–B/St. Louis for 15 years during which time he served as a Division Manager, National Sales Manager, and Assistant to the Vice–President for Marketing. There was certainly no need for A–B/St. Louis to instruct Ryan on the company's marketing strategy and distribution policies once he became Chief Executive Officer of Ritchie & Page. Indeed, Ryan testified that as a Division Manager for A–B/St. Louis he was responsible for conveying these policies to other independent wholesalers. Konrad testified that he derived his understanding of the brewer's policy from the language of the 1974 A–B Equity Agreement. In his words, "I believe ... that the spirit of the agreement stressed that they wanted us to sell in our market area." I have already noted that this interpretation of the agreement is entirely reasonable. In addition, while Konrad was not told in so many words that A–B/St. Louis did not want him to sell outside Konrad's APR, he was advised during a meeting with representatives of A–B/St. Louis that they did not want him to engage in sales activity which might dilute Konrad's efforts to maximize sales of A–B products within his market area.

In further support of their contention that A–B/St. Louis adopted a post-

*Schwinn* laissez faire attitude toward extra-territorial sales by the A–B defendants, plaintiffs point to the April 30, 1975 letter from A–B/St. Louis to Konrad and Ritchie & Page (discussed *supra*). However, the entire contents of this letter actually cut against the plaintiffs' position. While perfunctorily stating that A–B/St. Louis has no right under the law to resolve the distributors' "area dispute", the body of the letter leaves no doubt as to the brewer's position. The clear message conveyed by the letter is that A–B/St. Louis was satisfied with the status quo and under no circumstances should the distributors actively compete between themselves for the retail accounts in question. Significantly, the tone and overall effect of this letter is very similar to that of the 1974 A–B Equity Agreements. Rather than demonstrating the absence of an A–B/St. Louis policy against extra-territorial sales, as plaintiffs contend, the letter appears to represent yet another example of the manner by which A–B/St. Louis endeavored during the *Schwinn* era to communicate its preference for territorial exclusivity while avoiding the appearance of imposing such exclusivity on its distributors.

With regard to the rationality of the A–B defendants' purported fear of brewer sanctions, there is no question that the risks to personnel of A–B/Newark associated with engaging in extra-territorial sales were real and substantial. A–B/Newark personnel were employees of A–B/St. Louis. As in any employment relationship, the ultimate sanction for deviating from the express policy directives of the company was employment termination. William Reisenbeck, who as the former Eastern Region Manager of the A–B Wholesale Operations Division was responsible for the operation of A–B/Newark, testified:

Q: What was your understanding as to what would happen if there was a management at the Newark operation that sought to increase sales be [sic] beyond their territory?

A: They would probably get fired.

Q: Why do you say they would get fired if they went beyond their territory of area?

A: It's just a very strong policy of the company, you do not sell outside the territory, period.

Whether the fear of brewer sanctions asserted by the remaining five independent A–B wholesaler defendants constitutes a credible non-conspiratorial business justification for refraining from extra-territorial sales presents a more difficult question. Not surprisingly, there is no evidence that these A–B defendants were ever overtly threatened by A–B/St. Louis with termination of their distributorship agreement or other sanctions if they engaged in sales outside their assigned APRs. At least during the period when the *Schwinn per se* rule was in effect, A–B/St. Louis could not have terminated or expressly threatened to terminate an independent distributor solely for its refusal to restrict sales to the brewer-assigned APR without exposing itself to antitrust liability. Even under the most narrow interpretation of *Schwinn,* any such terminations or threats of termination would likely have been construed to be the kind of "firm and resolute" enforcement of vertical restraints on product resale expressly prohibited by the *Schwinn* Court. 388 U.S. at 372, 87 S.Ct. at 1862; *see also, Janel Sales Corp.,* 425 F.2d at 406.

The evidence suggests that some if not all of the A–B defendants were aware of the legal constraints on the brewer's ability to strictly enforce its policy favoring territorial exclusivity. For example, in the April 30, 1975 letter from A–B/St. Louis to Konrad and Ritchie & Page, the brewer expressly stated that "the law does not allow exclusivity." Thus, for the A–B defendants' professed fear of brewer sanctions to be credible, their apprehensions must have been reasonably grounded in a belief that A–B/St. Louis might contrive alternative reasons for imposing sanctions as a pretext for punishing a distributor for engaging in extra-territorial sales. There is ample evidence in the record to support a conclusion that such apprehensions would not have been unreasonable.

Under paragraph 15 of the 1974 A–B Equity Agreement, A–B/St. Louis reserved "the right to terminate this Agreement at any time by giving Wholesaler at least 90 days written notice ... Upon such termination, the relationship between Anheuser-Busch and Wholesaler shall thereafter be that of purchaser and seller on an individual purchase order basis, ... terminable at will by either party at any time." The agreement also required the distributor to satisfy Sales and Merchandizing Standards which were worded in general and indefinite terms. Under paragraph 5 of the agreement, failure to satisfy these standards in its APR was grounds for termination of a distributor's relationship with A–B/St. Louis.

> If a Wholesaler should fail to use or observe one or more of the sales and merchandizing methods and standards ... in a manner and to the extent consistent with the type of market which is Wholesaler's primary market area, Anheuser-Busch shall have the right to terminate this Agreement.

The first two paragraphs of the 1974 A–B Equity Agreement also define the distributor's obligations in extremely broad terms. Under paragraph one, the distributor agreed "to exercise its best efforts" to market A–B products in its designated APR. Paragraph two further refers to the distributor's "efforts to achieve maximum market representation" of A–B products in the assigned territory. Plaintiffs' own experts acknowledged during their oral depositions that A–B/St. Louis was the final arbiter of whether each A–B defendant was exerting its "best efforts" to achieve "maximum market representation" and satisfying the brewer's sales and merchandizing standards within its APR as required under the agreement. Dr. Jordan admitted that the criteria for determining whether a distributor had expended its "best efforts" in its APR were not set forth in the agreement. Dr. Stiglitz similarly testified that the "best efforts" requirement was "made perhaps a deliberately vague term." Dr. Jordan further stated:

> Q: Where I direct your attention to are these words, "wholesaler's efforts to achieve maximum market representation of Anheuser-Busch products in wholesaler's primary market area ... What does that mean to you?
>
> A: It means representing Anheuser-Busch in the market in a manner that in the opinion of Anheuser-Busch is acceptable.

The broad and undefined nature of the distributor's obligations under the agreement unquestionably conferred upon A–B/St. Louis considerable latitude to find fault with the distributor's performance and come up with sufficient grounds for termination if in the brewer's own judgment it felt the distributor's conduct warranted such action.

The 1974 A–B Equity Agreement also did not preclude A–B/St. Louis from unilaterally imposing other sanctions on a distributor short of termination for failure to satisfy the brewer's expectations. Paragraph one of the agreement stated that A–B/St. Louis "does not grant exclusivity to Wholesaler in its primary market area." Under a reasonable interpretation of this provision, A–B/St. Louis could, without giving a reason or justifying its action, appoint a second wholesaler to market A–B products in an existing wholesaler's APR. When confronted with this prospect during his deposition, Dr. Jordan conceded that such an action by A–B/St. Louis would be a serious sanction to a distributor which could be tantamount to an "effective termination." In response to violations of its marketing policies, A–B/St. Louis also could withhold at its discretion certain assistance upon which the A–B defendants relied, including credit for beer purchases, marketing and advertising materials, and funds aimed at sharing the cost of the distributor's promotional activities.

Thomas Ryan, who as previously mentioned became Chief Executive Officer of Ritchie & Page after having been employed by A–B/St. Louis in key managerial positions for 15 years, stated in his certification that "wholesalers, including Ritchie & Page, would invite potentially hostile brewer scrutiny if it sold outside its designated territory and challenged Anheuser-Busch's

policy." As reflected in the preceding discussion, A–B/St. Louis had ample opportunity to penalize a distributor for engaging in extra-territorial sales without having to disclose the underlying reason for the punitive actions.

The record further demonstrates that the business circumstances of the A–B defendants were such that they could ill afford to engage in conduct which might provoke a punitive response from A–B/St. Louis. The sale of A–B products represents the vast majority of each of the A–B defendants total sales. In particular, the sale of A–B products comprises 80% of High Grade's current total sales, approximately 95% of Harrison's total sales since at least 1979, at least 90% of Ritchie & Page's total sales from 1978 to the present, 97% or more of Konrad's current total sales, and 98.6% of Crown's current total sales and over 90% of its total sales since 1979. Given the degree of their dependence on the sale of A–B products, the A–B defendants could have reasonably concluded that the prospect, however remote, of being penalized by A–B/St. Louis for violating its marketing policies was an unacceptable business risk. Indeed, Dr. Jordan conceded during his deposition that a distributor's decision to refrain from distributing beer outside its assigned territory would be a rational business decision even if the risk of termination for this conduct was relatively slight. He testified that if a distributor had a 99% chance of making $1,000 per month profit on out-of-territory sales but was subject to a 1% chance of termination of the distributorship as a result of these sales, it would be a reasonable business decision for a distributor to decide not to take that risk.

Plaintiffs argue that the A–B defendants' purported fear of brewer sanctions is belied by the absence of any record evidence that A–B/St. Louis ever actually penalized a distributor for selling outside its assigned territory. This argument, however, places the proverbial cart before the horse insofar as there is also no evidence that the A–B defendants ever gave A–B/St. Louis a reason to impose such penalties. Plaintiffs themselves concede that, with the exception of a few isolated instances, the A–B defendants confined their sales activity to their respective APRs.

Moreover, the record does show that A–B/St. Louis did terminate its relationship with three separate New Jersey distributors in the 1950's for inadequate sales and merchandising performance in their assigned territories. While there is no evidence that these distributors were terminated for engaging in extra-territorial sales, the terminations do reflect the willingness of A–B/St. Louis to impose the severest of sanctions for a distributor's failure to meet the brewer's vaguely-defined standards of performance. This lesson certainly was not lost on Harrison which acquired the territories of two of the terminated distributors, or High Grade which was given part of the territory of the third.

Plaintiffs further argue that the A–B defendants could not have reasonably feared punishment by the brewer for sales outside their APRs because A–B/St. Louis never implemented a formal procedure for detecting such sales behavior. Plaintiffs rely on testimony of Richard Woodruff that he never asked any of the A–B defendants whether they were selling outside their APRs or whether other A–B distributors were selling in their APRs, and that he was not aware of any other employee of A–B/St. Louis assigned the responsibility of ascertaining whether any of the A–B defendants were selling A–B products outside of their APRs. However, A–B/St. Louis was undoubtedly aware of the amount of beer it was delivering to each distributor, and, in accordance with the Sales and Merchandizing Standards set forth in the 1974 A–B Equity Agreement, each distributor was required to maintain records "to reflect sales made to individual retail establishments served by Wholesaler" and to promptly submit to A–B/St. Louis "Sales and Inventory reports and such other records and reports and financial data as from time to time may reasonably be requested by Anheuser–Busch." On the basis of these facts alone, the A–B defendants could have reasonably conclud-

ed that sales of A–B products outside their respective APRs would not go undetected by A–B/St. Louis for long.

The evidence demonstrates that A–B/St. Louis long maintained a strong policy preference for territorial exclusivity, and that the A–B defendants were fully cognizant of this policy preference. There is also a sufficient factual basis for concluding that the A–B defendants reasonably believed that they would have jeopardized their relationship with A–B/St. Louis and risked losing a major share of their business if they failed to comply with the brewer's policy. One of plaintiffs' own economic experts admitted that this risk justified a decision to refrain from extra-territorial sales. In effect, the A–B defendants have adduced a sound business reason for refraining from intrabrand competition. Thus, plaintiffs' evidence that the A–B defendants failed to take advantage of profitable sales opportunities outside their assigned territories does not "tend to exclude the possibility" that this conduct was entirely consistent with their long-term economic interests.

#### d. *Motive*

■ Under *Venzie*, no conspiracy may be inferred from circumstantial evidence unless the defendants shared a common motive to coordinate their behavior. 521 F.2d at 1314. Although questions of motivation implicate the actual state of mind of the actors whose conduct is being challenged, in practice the state of mind of antitrust defendants must be inferred from objective business conditions. If under the factual circumstances which gave rise to the challenged conduct the defendants could not have reasonably believed that they would realize a distinct benefit from concerted action, they would have had no incentive to coordinate their behavior and there would be no basis for inferring a conspiracy. In other words, a common motive to conspire will not be inferred from circumstantial evidence unless this evidence supports a conclusion that reasonable persons in the defendants' position had something to gain from coordinated behavior. *See,* Areeda, *supra.* at ¶ 1412. Similarly, a common motive to conspire will not

be inferred from circumstantial evidence unless this evidence tends to show that the defendants would not have enjoyed certain economic benefits in the absence of concerted action. A conspiracy would be economically senseless·if the alleged conspirators would have derived the same business advantages whether or not they coordinated their conduct.

I concluded in the preceding section that the refusal of the A–B defendants to engage in intrabrand competition was consistent with their long-term economic interests. In particular, they avoided the risk of provoking brewer sanctions which could have destroyed their businesses. The evidence additionally suggests that the A–B defendants derived other substantial economic benefits by complying with the brewer's policy favoring territorial exclusivity. The evidence demonstrates that this policy was a central feature in a successful nationwide marketing strategy. There is no dispute that A–B/St. Louis and its New Jersey distributors gained dramatic increases in market share over the past twenty years. For example, Ralph Rapisardi noted in his affidavit that Crown held a market share of only 8 or 9 percent in 1969, but currently holds a market share in excess of 50 percent. Mr. Rapisardi and other of the A–B defendants expressly attributed these marketing advances to their willingness to focus their efforts on servicing retail accounts within their assigned territories in full compliance with A–B/St. Louis corporate policy. While there is no way of determining from the record the extent to which the absence of intrabrand competition was responsible for these increases in market share, the A–B defendants could have reasonably concluded that strict adherence to the brewer's policy was an important contributing factor. *See generally, Sylvania,* 433 U.S. at 54–55, 97 S.Ct. at 2560 (noting the potential procompetitive effects of vertical territorial restraints). Rather than grudgingly complying with the brewer's policy favoring territorial exclusivity solely as a means of preserving their A–B distributorships, the evidence shows that the A–B defendants approved of the policy, finan-

cially benefitted from it and willingly followed it. Thus, for there to be a genuine issue of material fact on the question of motive, plaintiffs must present some evidence from which it can reasonably be inferred that a horizontal conspiracy would have conferred certain benefits upon the A–B defendants separate and apart from any benefits they derived from merely complying with the vertical direction of the brewer.

Plaintiffs contend that the refusal of the A–B defendants to engage in intrabrand competition gave them a monopoly over the sale of A–B products in their respective territories. Plaintiffs argue that this monopoly enabled the A–B defendants to artificially inflate their prices above those levels which otherwise would have existed if they had actively competed among themselves for sales to retail accounts outside their assigned territories. Plaintiffs conclude that the A–B defendants' interest in maintaining monopoly control over the pricing of A–B products provided them with a powerful economic incentive to horizontally conspire to allocate and enforce exclusive territories. However, plaintiffs' own economic experts testified that these anticompetitive effects on pricing would be present regardless of whether territorial exclusivity were maintained at the vertical direction of A–B/St. Louis or through a horizontal conspiracy. Thus, if the A–B defendants were able to obtain monopoly control over pricing merely by adhering to brewer-directed restraints on intrabrand competition, they would have no additional reason to conspire horizontally to achieve the same result. In other words, the motive to enter a horizontal conspiracy was at best no greater than the motive to continue adhering to the policy of A–B/St. Louis. Under *Matsushita,* such ambiguous circumstantial evidence does not create a "genuine issue for trial." 106 S.Ct. at 1362 n. 21. Even if plaintiffs were able to prove at trial that restraints on intrabrand competition enabled the A–B defendants to increase prices beyond competitive levels, this fact alone would not permit a jury to choose between the competing inferences of conspiratorial or non-conspiratorial motive.

Given their admitted satisfaction with the brewer's policy favoring territorial exclusivity, the A–B defendants might have had a plausible reason to reinforce the vertical direction of A–B/St. Louis with a horizontal agreement to the same effect, particularly in the post-*Schwinn* era when A–B/St. Louis was legally disabled from directly enforcing the exclusivity of its assigned APRs. However, there is not the slightest hint in the evidence that any such reinforcement was ever needed. The need for strengthening existing vertical restraints on intrabrand competition with a horizontal agreement would not have arisen unless one or more of the A–B defendants exhibited a willingness or desire to encroach upon neighboring territories in violation of the brewer's policy and the brewer failed to exert its power and influence to prevent or attempt to stop such activity. There is no evidence that any of the A–B defendants showed the slightest inclination following the *Schwinn* decision to expand their sales activity beyond their assigned territories. Rather, the evidence shows only that the A–B defendants honored the boundaries of their assigned territories before, during and after the period when *Schwinn* was in effect. Furthermore, as the evidence relating to the "area dispute" between Konrad and Ritchie & Page illustrates, when questions arose during the *Schwinn* period regarding the allocation of retail accounts located along the boundaries of the brewer-assigned territories, the A–B defendants sought the direction of A–B/St. Louis rather than resolving the questions themselves as would be expected if there were a horizontal agreement.

The evidence demonstrates that the interest of each of the A–B defendants in complying with the policy of A–B/St. Louis favoring territorial exclusivity was sufficiently compelling to obviate any need or motivation to conspire horizontally. Plaintiffs, on the other hand, have failed to show that the A–B defendants would have derived any separate benefits from entering a horizontal conspiracy.

e. *Conclusion*

The evidence in this case supports a conclusion that the A–B defendants had an independent (i.e., non-conspiratorial) business reason for refraining from intrabrand competition. In particular, there is a sufficient factual basis for finding that the policy preference of A–B/St. Louis for territorial exclusivity was a significant factor impinging upon the business decisions of the A–B defendants and that the A–B defendants purported fear of brewer sanctions for engaging in extra-territorial sales was reasonable under the circumstances. Plaintiffs for their part have failed to present evidence which tends to exclude the possibility that the A–B defendants were merely responding to the vertical direction of A–B/St. Louis when they confined sales to their assigned APRs. Rather, the evidence offered by plaintiffs as proof of a horizontal conspiracy is in virtually every instance equally consistent with conduct resulting from vertically-directed restraints on intrabrand competition.

The reports and deposition testimony of plaintiffs' economic experts do not cure these evidentiary deficiencies. Dr. Jordan's report, for example, points out a number of factors showing that the A–B defendants could have profitably sold A–B products outside their assigned APRs. He repeatedly concludes that the A–B defendants' failure to make such sales can be explained "only" by a horizontal conspiracy. However, he admitted during his deposition that this conduct was equally explainable by compliance with vertical direction from A–B/St. Louis.

Dr. Stiglitz devoted much of his report to identifying certain anticompetitive effects resulting from the defendants' practice of confining sales to their assigned APRs. Dr. Stiglitz also acknowledged in deposition testimony that a number of these anticompetitive effects were consistent with exclusive territories resulting from either a horizontal conspiracy or vertical direction. In fact, he identified only two such effects which he considered consistent with horizontal conspiracy but inconsistent with vertical direction: 1) the static, inefficient design of the defendants' territories, and 2) the practice of some defendants not to deliver beer to a co-op located inside their territories if the beer was ordered by members of the co-op located outside their territories. Dr. Stiglitz concluded that these two factors were inconsistent with vertical direction by A–B/St. Louis because they resulted in inefficient delivery to retailers and A–B/St. Louis had an incentive to see that its products reached retailers as efficiently as possible.

With regard to the first of the above factors, Dr. Stiglitz noted that if A–B/St. Louis had been responsible for the system of territories he would have expected to see periodic realignments of the boundaries to minimize delivery costs in light of changing demography and roads. However, this observation ignores interests other than minimizing distributor transportation costs which might have been equally if not more important to A–B/St. Louis. A–B/St. Louis had an expressed interest in encouraging its distributors to invest the time, energy and resources necessary to develop and maintain the good will of beer retailers in the distributors' assigned territories. The 1974 A–B Equity Agreement reflects the brewer's belief that successful beer wholesaling "requires highly personalized promotion and sales service efforts." The agreement further requires the distributor's best efforts in "maintaining satisfactory and continuous liaison with the retail trade." The Supreme Court in *Sylvania* expressed this interest in the following terms:

> Established manufacturers can use [vertical restrictions] to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products ... The availability and quality of such services affect a manufacturer's good will and the competitiveness of his product.

433 U.S. at 55, 97 S.Ct. at 2560. Periodic realignment of territorial boundaries by A–B/St. Louis which resulted in distributors losing market areas in which they had invested their efforts undoubtedly would

have discouraged them from continuing to make such investments.

The record reflects that the second factor cited by Dr. Stiglitz relating to co-op sales has little if any relevance to plaintiffs' conspiracy claims against the A–B defendants. Konrad, Ritchie & Page and Crown never refused a co-op order because they never received a co-op order during the relevant time period. A–B/Newark and Harrison refused to sell to any co-ops, not just to co-op members outside their territories.

 The deficiencies in plaintiffs' evidence of a horizontal conspiracy among the A–B defendants is particularly pronounced when the evidence as to the participation of each individual A–B defendant in the alleged conspiracy is separately analyzed. The evidence of A–B/Newark's involvement in the alleged conspiracy is weak to non-existent. In particular, plaintiffs cite to A–B/Newark's acquiescence in High Grade's sales to Witty's Rahway and the fact that A–B/Newark received a telephone call from another distributor regarding the transshipping of International Beverage Company. I have already discounted this evidence as not probative of a horizontal conspiracy. Lastly, in what can only be attributed to a desperate effort to implicate A–B/Newark in the alleged conspiracy, plaintiffs rely on testimony of Dr. Stiglitz to the effect that "A–B/Newark may have served as a cartel ringmaster enforcing the horizontal conspiracy through the agency of the brewer." Neither Dr. Stiglitz nor the plaintiffs offer a single shred of evidence to support this rank speculation.

With regard to the other independent A–B wholesaler defendants, evidence of practices such as the exchange of beer at cost, selective sales abstention, and convenience sales, as noted earlier in this opinion, is entirely consistent with vertically-directed territorial exclusivity. The balance of the evidence, most of which also has been addressed at one point or another in this opinion, is not sufficiently probative of each individual distributor's involvement in the alleged horizontal conspiracy to generate a material issue for trial.

Summary judgment on the issue of conspiracy is granted in favor of each of the A–B defendants.

### 2. Circumstantial Evidence of a Miller Distributor Conspiracy [6]

#### a. *Parallel Conduct*

Unlike the A–B defendants, the Miller defendants do not concede that they engaged in parallel business behavior. In particular, the Miller defendants assert that there was no common pattern to their sales behavior. The majority of the Miller defendants made sales of Miller products outside the territories assigned to them by Miller. Warren's sales of Miller products outside its assigned territory were always in excess of 5% of its total sales between 1979 and 1983. For example, 6.43% of its total sales in 1982 were comprised of sales to retailers located outside its assigned territory. In 1983, prior to entering the exclusive territorial agreement with Miller, Warren's sales outside its APR constituted approximately 14% of its total sales. Hub City sold Miller products to between 5 and 10 retail accounts in Warren's assigned territory between 1979 and 1983. MS & W similarly sold Miller products on a regular basis to six on-premises retail accounts in Warren's APR and also sold some Miller products in Kristen's APR. Point Pleasant made as much as 1.4% of its total annual sales between 1979 and 1982 to retail accounts outside its assigned territory. Kristen made a small fraction of its total sales between 1981 and 1983 to co-op members located outside its territory. Trip sold Miller products to a single retail account in Kristen's territory for a brief period in 1981 or 1982. Garden State, Hub Beer and South Jersey sold no Miller beer out of their Miller assigned territories.

The Miller defendants contend that the undisputed evidence that most of them sold

---

**6.** The independently admissible evidence on which plaintiffs rely to establish the existence of a conspiracy among the Miller defendants and the participation of each of the Miller defendants in the alleged conspiracy was proffered by them on the hearing on these motions.

varying quantities of Miller beer outside their assigned territories destroys plaintiffs' theory of concerted action by the Miller defendants to maintain exclusive territories. This contention certainly would be correct if the scope of the horizontal conspiracy alleged by plaintiffs is limited to an agreement to confine sales to the boundaries of the territories assigned to each distributor by Miller. The report of Dr. Jordan reflects that this was his understanding of the nature of the plaintiffs' conspiracy claims. The issues addressed in his report are twofold: 1) prior to May 1983, "did the defendant distributors treat their [brewer-assigned] APRs as if they were exclusive distribution territories," and "[i]f so, 2) were these exclusive territories the result of a horizontal conspiracy among the defendant distributors?" However, plaintiffs' conspiracy claims cannot be read quite so narrowly. The gravamen of plaintiffs' complaint is that the defendants conspired to eliminate intrabrand competition by maintaining a system of exclusive distribution territories in which each distributor agreed to confine its sales. Plaintiffs allege in paragraph 33 of their complaint:

> The purpose and effect of said system is that no distributor sells beer outside of that distributor's exclusive territory; no member of the plaintiff class can buy any brand of beer from a distributor other than the exclusive distributor for that brand of beer in the area in which the class member is located.

Plaintiffs contend that the parameters of the exclusive territories were established by agreement among the distributors, and that these territories were not necessarily coincident with the Miller-assigned territories.

Two equally plausible inferences may be drawn from the undisputed evidence that the Miller defendants engaged in sales outside their Miller-assigned territories. It could reasonably be inferred from this evidence that the Miller defendants in fact actively engaged in intrabrand competition during the relevant time period in contra-

diction of plaintiffs' conspiracy claims. On the other hand, this evidence might simply reflect the fact that the Miller defendants established exclusive territories which were not coextensive with the Miller-assigned APRs. Thus, evidence of sales outside the brewer-assigned territories, standing alone, has an essentially neutral impact on plaintiffs' conspiracy claims.

The critical issue is whether the Miller defendants who sold Miller products to retailers outside their Miller-assigned territories were actively competing for these sales with the Miller distributors in whose brewer-assigned territories these retailers were located. The importance of this question should not be underestimated. As will be developed below, plaintiffs' allegation that the Miller defendants conspired to eliminate intrabrand competition necessarily could not survive in the face of uncontroverted evidence that they actively engaged in intrabrand competition during the relevant time period. On the other hand, if the evidence shows that the Miller defendants in whose brewer-assigned territories other Miller distributors were selling Miller products did not object to these sales, or did not attempt to recapture these sales, or otherwise appear to have acquiesced in these sales, this evidence would significantly strengthen the inference that the Miller defendants had allocated retail accounts among themselves and adjusted the boundaries of the brewer-assigned territories by horizontal agreement.[7] The evidence clearly favors the inference that the extra-territorial sales of the Miller defendants were the product of intrabrand competition and not simply a manifestation of a horizontal conspiracy.

There is some evidence that the Miller defendants did not acquiesce in incursions into their Miller-assigned APRs by other of the Miller defendants. In answers to interrogatories, Kristen stated that there were occasions when other Miller distributors, believed to be Trip and Warren, made sales of Miller products to retailers located in

---

7. The inference of conspiracy would be all the more compelling in view of the fact that the very existence of sales outside the Miller-as-

signed territories detracts from the credibility of the Miller defendants' purported fear of provoking brewer sanctions by engaging in such sales.

Kristen's APR. Kristen voiced its objections to these sales "[d]uring a few and isolated conversations between Kristen and Trip ... and Warren .., respectively, concerning other subject matters." There would have been no reason to raise such objections if these sales by Warren and Trip were made pursuant to a horizontal realignment of the brewer-assigned territories.[8] In further response to these incursions by Trip and Warren into its APR, Kristen "sought to obtain the retail accounts involved through [Kristen's] sales representatives visiting the accounts and emphasizing [Kristen's] service and reliability." David Kramer of South Jersey Distributors, Inc., the predecessor of defendant South Jersey, similarly testified that there was a single retailer in its APR, the Village Pub in Beach Haven, which refused to purchase Miller products from South Jersey Distributors, Inc. due to a personal disagreement with the previous owners of the distributorship. Instead, the Village Pub purchased its inventory of Miller products from Point Pleasant. Notwithstanding the fact that Point Pleasant was already servicing the Village Pub, apparently with the authorization of Miller, South Jersey Distributors, Inc. endeavored to convince the retailer to change distributors. However, "no amount of persuasion by [its] salespeople [could] convince [the Village Pub] to buy from [South Jersey Distributors, Inc.]"[9] Edward Goracy also tes-

---

**8.** Plaintiffs argue, apparently in the alternative, that these direct communications are evidence of the existence of a horizontal agreement between the Miller defendants not to sell in each other's territories. However, objections of this sort would be expected whether the distribution territories were established by horizontal agreement or vertical direction from Miller. If the latter were the case, the distributor also would be expected to complain to Miller about the extra-territorial sales by the other distributors. In its interrogatory answers, Kristen stated that it notified Miller that other of the Miller defendants were distributing Miller products in its APR so that Miller would not hold Kristen responsible if any of these products did not meet Miller's quality standards.

Furthermore, the nature and substance of Kristen's communications with Trip do not support the inference of conspiracy. Plaintiffs contend that Agnes Kristen, Vice–President of Kristen, telephoned Francis Tripucka, President of Trip, and "requested him not to sell Miller beer to retailers located in her territory." However, in her deposition testimony and in an affidavit submitted in response to plaintiffs' opposition to the present summary judgment motion, Agnes Kristen stated that the purpose of her phone call to Mr. Tripucka was to advise him that a single retailer in Kristen's APR, Chas Vic, was in default on its credit obligations and that she believed that credit sales to Chas Vic by Trip would be in violation of the New Jersey ABC regulations. Under N.J.A.C. 13:2–24.4, in the event a retailer defaults on its credit obligations to a wholesale distributor, the distributor is required to notify all other distributors of the default, and credit sales to the defaulting retailer are prohibited until the default is cured. N.J.A.C. 13:24.4(c)(2). So long as the retailer remains in default, sales can only be made on a C.O.D. basis. When Kristen put Chas Vic on C.O.D. basis, Chas Vic's owner told Kristen's salesman that Chas Vic was still able to obtain credit from Trip. Kristen testified that she called Tripucka to inform him of the fact that Chas Vic was in default.

There is no evidence that Kristen ever requested that Trip refrain from selling Miller products to Chas Vic or any other retailer in Kristen's territory. At best, the evidence of this telephone communication demonstrates only an opportunity to enter into an unlawful agreement. As previously noted, such evidence is insufficient to defeat summary judgment. *Venzie,* 521 F.2d at 1313.

**9.** There is additional evidence that Point Pleasant's sales to this single retailer did not result from an agreement between South Jersey Distributors, Inc. and Point Pleasant to allocate this retail account to Point Pleasant. John Wardell of Point Pleasant testified that the "Miller Brewery wants full distribution and they want to be selling every account, every retail license, in the market ... [P]rior to '81 ... [the Village Pub] would not buy from ... [South Jersey Distributors, Inc.], and, as I remember, Miller wanted them serviced and wanted the distribution and they said to go ahead and serve them." This testimony shows that Point Pleasant's sales to the Village Pub were made at the direction and with the permission of Miller.

Moreover, Beach Haven is located at the southernmost end of Long Beach Island. Point Pleasant's Miller territory did not include Long Beach Island although it sold other brands of beer there. As the plaintiffs themselves note in their opposition brief, "[i]n order to reach Beach Haven, Point Pleasant trucks had to take a narrow causeway out to Long Beach Island, and had to pass through the Town of Ship Bottom, where Point Pleasant had retail accounts to whom they regularly sold other brands of beer, but not Miller." I can conceive of no business reason for Point Pleasant and South Jersey Distributors, Inc. to have divided retail accounts for the distribution of Miller

tified that if Warren became aware that other Miller distributors were making co-op sales of Miller products to co-op members located in Warren's APR, it would respond by analyzing its prices to determine whether they were at competitive levels. "[Warren] had to compete and take a look at [its] prices so that [it] could meet that competition and serve those customers." The conduct of Kristen, South Jersey Distributors, Inc. and Warren described above is indicative of some degree of intrabrand competition among the Miller defendants.

Whether exclusive territories are established by horizontal agreement or vertical direction, one would expect there to be contiguous and identifiable boundaries to the territories and that each distributor would attempt to achieve maximum coverage in its defined market area on an ongoing year-round basis. The evidence shows that the Miller defendants persistently sought to establish regular accounts with each retailer located within the boundaries of their Miller-assigned APRs. For example, Frank Tripucka testified that Trip was "constantly striving" to expand the number of retailers within its APR to which it sold Miller products.

Q: Does the Miller Brewing Company require you to try and sell beer ... to every account?

A: Absolutely.

Q: Is there a written requirement?

A: No, but they constantly monitor our selling performance.

The evidence further shows that the Miller defendants instituted certain merchandizing practices which were intended to assure continuous sales of Miller products to retailers located within their Miller-assigned territories. Edward Goracy of Warren testified that Warren's merchandizing efforts within its Miller APR included a wide array of services to retailers such as weekly solicitations, weekly deliveries, and 24–hour deliveries. Goracy further testified that Warren has consistently provided all of these services "to all of Warren's retail accounts within Warren's Miller geographic distribution territory" from 1979 through to the present.

In contrast to the continuity which characterized the Miller defendants' sales efforts within their brewer-assigned territories, there does not appear to have been any consistent pattern to their extra-territorial sales as would be expected if there had been a horizontal reapportionment of the brewer-assigned territories. Kristen limited its extra-territorial sales to co-ops which had members located outside Kristen's Miller APR. MS & W sold Miller products outside its Miller APR only to a number of individual on-premises retail accounts. Whereas, Hub City confined its extra-territorial sales to retail licensees to whom it was already selling other brands of beer. Warren sold Miller products to co-op members and numerous other individual retailers outside its Miller territory.

Of the Miller defendants, Warren's extra-territorial sales activity was by far the most extensive. Significantly, there does not appear to have been any territorial direction to Warren's sales outside its Miller APR. In particular, Warren's extra-territorial sales were not concentrated in one specific area adjoining its Miller APR as might be expected if the Miller defendants had agreed among themselves to adjust the boundaries of the territories assigned by Miller. Rather, from the early 1970's when it first began distributing Miller products until 1983, Warren sold Miller products to retailers situated throughout the State of New Jersey. Frank Banko, President of Warren, stated in an affidavit submitted in support of the present summary judgment motion that throughout the early 1970's Warren sold Miller products wherever it sold the other brands of beer it carried at

products on Long Beach Island in such a seemingly haphazard and economically senseless manner. The only rational inference which can be drawn from the evidence of Point Pleasant's sales to the Village Pub is that Point Pleasant was simply responding to the vertical direction of Miller.

Apart from its sales to the Village Pub, Wardell testified that Point Pleasant had also sold Miller products to one retailer in Ship Bottom and possibly two or three other retailers on Long Beach Island. However, there is no evidence regarding the factual circumstances surrounding these sales.

that time. He further stated that the brewers of these other brands did not assign territories and allowed Warren to sell their products statewide. Prior to May 1983, one of Warren's largest accounts was the Shop–Rite co-op. Warren sold Miller products to as many as 27 members of this co-op who were located in eight different counties outside Warren's Miller-assigned territory. Thus, as a result of its sales to this single co-op, Warren was effectively selling Miller products in the brewer-assigned territories of most if not all of the other Miller defendants. Frank Banko also referred to several other co-ops which had member licensees inside and outside Warren's Miller APR most of which purchased Miller products from Warren prior to 1983. In 1982 alone, Warren also sold Miller products to over 100 other retailers outside its Miller APR. The absence of any apparent territorial direction to Warren's extra-territorial sales is inconsistent with plaintiffs' horizontal conspiracy hypothesis. It would have been impractical and economically irrational for the Miller defendants to allocate and attempt to enforce exclusive territories which had no clearly-defined or coherent boundaries.

If, as plaintiffs argue, the retail accounts to which Warren sold Miller products outside its APR were within the boundaries of a broader exclusive territory allocated to Warren by agreement among the Miller defendants, the evidence should show that Warren maintained consistent levels of sales to retailers located both inside and outside its APR. However, in contrast to Warren's merchandizing practices within its APR, there was a notable lack of continuity to its sales behavior outside its APR. Frank Banko stated in his affidavit that during the summer months, when consumer demand for beer is particularly high, Miller would "always cut [Warren's] orders sometimes with less than a day's notice." At such times, Warren could not be as-sured of having enough Miller beer to satisfy retailer demand both inside and outside its APR. Rather than cutting back on deliveries to all the retailers to whom it sold Miller products, irrespective of their location, Warren would reduce only its extra-territorial sales. As a result, "[d]uring the summer months a minimal amount of Miller products were sold outside [Warren's] APR."

Thus, retailers to whom Warren sold Miller products outside its APR were not treated as regular accounts allocated to Warren by horizontal agreement. Rather, the evidence suggests that Warren would independently decide to sell Miller products to retailers located outside its Miller-assigned APR only if it believed that these sales could be profitably made without jeopardizing its ability to meet the demand for Miller products within its APR. Indeed, in answers to interrogatories, Warren asserted that it had no formal or informal policy regarding requests from retailers outside its APR for the delivery of Miller products. Rather, each request was judged on an individual basis and the decision whether to fill each order was based on the profitability of the sale and the availability of the product. At his deposition, Edward Goracy similarly testified:

Q: Did [Warren] have a policy against delivering Miller beer to retailers outside [its] Miller territory prior to 1983?

A: No hard, fast policy.

Q: Was it sort of a day by day basis, a delivery by delivery basis?

A: More of an instance by instance type of appraisal and analysis, as the situation would arise.

The evidence of Warren's extra-territorial sales seriously undermines plaintiffs' allegation that the Miller defendants were engaged in parallel conduct in furtherance of a horizontal conspiracy.[10] At a mini-

---

**10.** Plaintiffs argue that the evidence of Warren's extra-territorial sales presented by way of the Banko affidavit should not be credited by the court on the present motion for summary judgment. Plaintiffs contend that the information presented in the affidavit is "inconsistent with" or "contrary to" Warren's prior answers to interrogatories and the sworn deposition testimony of Edward Goracy. The record does not bear out this contention. In interrogatories served in June 1985, plaintiffs requested each defendant to set forth its total annual sales of Miller beer

mum, this evidence supports the inference that Warren was not a participant in the alleged conspiracy. Dr. Stiglitz conceded during his deposition that he would change his opinion about Warren being a co-conspirator if the evidence showed that Warren had made only 5% of its Miller sales outside its APR to co-ops and other large accounts and these sales were not the result of a horizontal realignment of Warren's APR. He testified, in relevant part:

Q: What would convince you, what facts, if you found them, would convince you that Warren wasn't a co-conspirator?

. . . . .

A: If ... they had stolen say some very large accounts, some profitable large accounts from their adjacent territories.

Q: Such as sales to big co-ops ... or something like that?

outside its APR. Warren initially objected to this request as "burdensome, oppressive and overbroad." Following negotiations between counsel for Warren and the plaintiffs, Warren served supplemental interrogatory answers in which it stated that "Warren estimates that prior to May, 1983, *more than 5%* of its Miller sales may have been outside its territory" (emphasis added). During the course of their negotiations, plaintiffs' counsel apparently affirmed that this supplemental answer would be sufficiently responsive to the interrogatories at issue. During his subsequent deposition, Edward Goracy was asked whether "more than 95% of [Warren's] sales of Miller beer ... prior to 1983 was to retailers located within [its] Miller APR?" He testified that "[w]ithout the exact knowledge of [the] numbers, I would say that those figures might be close." He did not insist that "a more precise figure could not be calculated," as plaintiffs contend. Rather, Goracy testified that he could not provide a more precise figure without analyzing the customer billing invoices and/or sales reports for the years in question.

The record further reflects that the documents from which plaintiffs themselves could have derived more precise figures were readily available to them. According to Goracy, he and plaintiffs' counsel agreed during their negotiations that "if the plaintiffs needed further information regarding sales outside [Warren's] Miller APR that the documents would be made available at Warren's document production and that plaintiffs would compute these sales figures." Warren produced this documentation in July 1985, but plaintiffs apparently declined to make copies or otherwise perform a detailed examination of this material.

A: That's right ... That would be strongly suggestive that ... [t]hey were not going along with the horizontal conspiracy.

Q: Would you then conclude that they were not a part of the generalized Miller conspiracy? Would that be your conclusion from that strong suggestion?

A: ... I think the answer probably is yes.

. . . . .

A: ... [I]f they were intruding in selling large co-ops outside their territories, large sales in an aggressive manner, expanding their sales, that at that time they—I guess I would feel very hesitant to say they were part of the horizontal conspiracy.

. . . . .

A: I do know that they claim to have sold outside their territory.

Plaintiffs further contend that the Miller defendants should not be permitted to rely on sales information which Warren refused to compile in response to plaintiffs' interrogatories. However, these interrogatories sought only the total annual volume of sales and deliveries outside Warren's APR between 1979 and 1984. The Banko affidavit contains additional information regarding seasonal fluctuations in Warren's extra-territorial sales and descriptions of certain of its out-of-territory retail accounts which is outside the scope of plaintiffs' interrogatories. Thus, plaintiffs' objections to the Banko affidavit relate only to a single paragraph in which he sets forth percentage figures relating to the total volume of Warren's out-of-territory sales during 1982 and the first three months of 1983. Even if these precise percentage figures are disregarded, the fact remains that plaintiffs were on notice as early as the summer of 1985 that Warren had engaged in significant sales outside its APR estimated to have been in excess of 5% throughout the relevant time period. Indeed, Dr. Stiglitz acknowledged during his deposition that he was aware of Warren's claim that sales outside of its APR accounted for approximately 5% of its total sales. Plaintiffs certainly should have anticipated that evidence of these sales would have a direct bearing on their claim that the Miller defendants horizontally conspired to refrain from intrabrand competition.

In short, while Warren arguably should have supplemented its interrogatory answers with the percentage figures compiled by Warren and set forth in paragraph 2 of the Banko affidavit, its failure to do so does not significantly prejudice plaintiffs on the present summary judgment motion and does not warrant excluding this evidence from consideration.

Q: At the level of about five percent of sales.

A: Yes.

. . . . .

A: If they were selling say five percent outside their territory to large co-ops and ... this five percent does not represent a re-alignment of territories, this fact ... couldn't be interpreted in any way as satisfying needs of, you know, a Saturday or Sunday delivery, but represented an intrusion into other territories, that would be indicative ... of its non-participation as of that time in some aspects of that collusive arrangement.

. . . . .

Q: Well, assuming that there was no such territorial direction to its sales, except to the extent it was dictated by where the co-ops were, would you then conclude that Warren was not a conspirator?

A: I think I would.

The preceding discussion demonstrates that the facts are as Dr. Stiglitz assumed them to be in arriving at this conclusion. Warren's sales to retailers outside its APR were always in excess of 5% of its total sales during the relevant time period. Warren sold Miller products to large co-ops, at least one of which had members situated throughout the state. Moreover, the fact that there was no apparent territorial direction or continuity to Warren's extra-territorial sales makes it highly improbable that these sales resulted from a horizontal realignment of Warren's APR.

There is further evidence in the record, presented by another of plaintiffs' economic experts, that a conspiracy of the sort alleged by the plaintiffs could not have succeeded without the participation of each of the Miller defendants. Dr. Jordan wrote in his report:

If a distributor had not been a party to the [horizontal] agreement, its actions would have generated economic incentives that would have resulted in the elimination of exclusive distribution territories.

In particular, Dr. Jordan noted:

[I]f any one of the ... Miller distributors started selling a substantial amount of beer in all of the other ... Miller distributors' APRs, it would be in the best interest of all ... Miller distributors to perform similarly.

Dr. Jordan concluded that "[o]nly if all intra-brand distributors agree to treat their APRs as exclusive distribution territories will that system [of restraining intrabrand competition] work."

Warren's participation in a horizontal conspiracy to establish exclusive distribution territories would have been particularly crucial given the geographic position of its APR. The territory assigned to Warren by Miller during the relevant time period cut a broad swath across the north/central part of New Jersey, effectively separating the APRs of three Miller distributors to the north (Kristen, Trip and MS & W) from the APRs of five Miller distributors to the south (Hub City, Hub Beer, Point Pleasant, South Jersey and Garden State). Indeed, Warren was one of only two Miller distributors whose territorial boundaries during this period adjoined the territorial boundaries of four other Miller defendants. Thus, applying the reasoning of plaintiffs' own economic experts, a horizontal conspiracy to eliminate intrabrand competition could not have been sustained if, as the evidence suggests, Warren refused to recognize the exclusivity of surrounding territories.

Under *Fed.R.Civ.P.* 56, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Celotex* 106 S.Ct. at 2554. The Supreme Court in *Celotex* noted:

[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.

*Id.* at 2553 (original emphasis).

In support of their present summary judgment motion the Miller defendants

have presented proof of the absence of parallel conduct well beyond what is necessary to satisfy the initial burden imposed on a moving party under Rule 56. They have presented the unequivocal denials by each of the Miller distributors that they had any knowledge of or complicity in a horizontal agreement to establish and maintain exclusive distribution territories. They have identified undisputed evidence that most of the Miller defendants made some sales outside their Miller-assigned APRs. In the case of Warren they have shown that these sales were frequent and substantial. They have also presented evidence that the extra-territorial sales of the Miller defendants did not result from a horizontal realignment of the Miller APRs. Lastly, they have offered evidence suggesting that on the basis of the above facts the plaintiffs' own economic experts might find that the alleged horizontal conspiracy could not have been formed or successfully implemented. This evidence is more than sufficient under Rule 56(c) to show the absence of a genuine issue of material fact as to the alleged parallel conduct of the Miller defendants. Indeed, the evidence summarized above tends to negate the inference of concerted action by the Miller defendants to eliminate intrabrand competition through the vehicle of exclusive distribution territories.

■ In opposition to a properly supported summary judgment motion, the non-moving party must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'." *Celotex*, 106 S.Ct. at 2553. In order to demonstrate the existence of a "genuine issue for trial" with regard to the alleged parallel business behavior of the Miller defendants, plaintiffs have the clear burden on the present summary judgment motion of presenting "specific facts" which tend to exclude the possibility that the extra-territorial sales of the Miller defendants were the product of intrabrand competition. *Matsushita* 106 S.Ct. at 1357. Plaintiffs have failed to meet this burden.

As a preliminary matter, plaintiffs offer only scant evidence to support their principal contention that "no member of the plaintiff class [could] buy [Miller] beer from a distributor other than the exclusive distributor [of Miller beer] in the area in which the class member [was] located." Retailers Maurice Bierman and Ken Friedman testified that New Jersey retailers as a general rule could only purchase particular brands of beer from the distributors in whose exclusive areas the retailers were located. However, they testified only to specific instances where particular A–B distributors refused to fill orders for A–B beer because the retailers were located outside the distributors' A–B territories. There is some evidence that certain of the Miller defendants similarly refused to fill orders for Miller beer from retailers outside their APRs. In answers to plaintiffs' interrogatories, Trip stated that it would inform such retailers that Trip did not sell outside its APR. Point Pleasant similarly responded that it would provide such retailers with the name of the Miller distributor which serviced the retailer's area, or would ask a Miller representative to assist the retailer. However, this practice was not followed by all the Miller defendants. In answers to the same interrogatory questions, Warren asserted that it did not automatically reject orders for Miller products from retailers outside its APR. Rather, it reviewed the merits of each individual order and decided whether to fill the order on the basis of factors including but not limited to the mere location of the retailer.

Furthermore, there is other evidence which directly contradicts plaintiffs' contention that "there was no retailer that had a choice as to from which distributor he could buy [Miller] beer." Certain of the Miller defendants, including Point Pleasant, serviced retailers outside their APRs who had expressed an unwillingness to purchase Miller products from the Miller distributor in whose APR the retailer was located. As noted earlier in this opinion, Point Pleasant regularly serviced the Village Pub in Beach Haven because the owner refused to purchase Miller products from South Jersey Distributors, Inc. which

was the designated Miller wholesaler for Long Beach Island at that time. MS & W similarly sold Miller products on a regular basis to an on-premises retail account in Warren's APR because the tavern's owner "didn't want to buy Miller products from Warren." Robert Luke testified:

I do recall one customer specifically asked us to sell Miller products to him otherwise he wasn't going to buy Miller from anybody.

Kristen also stated in answers to plaintiffs' interrogatories that it had one account in the APR of MS & W which Kristen serviced prior to 1983 "by demand of that retailer and with permission of Miller." This evidence demonstrates that prior to 1983 retailers did in fact have some degree of latitude in selecting the Miller distributors with whom they would do business.

More importantly, in an effort to rebut the evidence of intrabrand competition among the Miller defendants, plaintiffs exclusively rely on conclusory arguments for which they provide little if any factual support. They contend that the evidence of sales by the Miller defendants to retail accounts outside their APRs "proves that [exclusive] territories were set by the defendants and not by [Miller]." At another point in their opposition papers, plaintiffs flatly assert that

sales outside the [brewer-assigned APRs] (such as [those by] defendant Warren ...) are not evidence of conduct inconsistent with a horizontal conspiracy but instead confirm its existence, since it is that very conspiracy which allocated territories different from the [APRs].

On close inspection, however, it is apparent that these sweeping conclusions arise out of an evidentiary vacuum.

In support of their contention that the extra-territorial sales of the Miller defendants resulted from a horizontal realignment of the brewer-assigned territories, plaintiffs cite to only two items of evidence relating to conduct by New Jersey distributors of Miller products. First, plaintiffs cite to a single page of deposition testimony of Edward Goracy of Warren in which he stated that he had been informed by

Warren's drivers and representatives of Miller that Hub City was selling Miller products to retailers in southern Middlesex County within Warren's APR prior to 1983. Plaintiffs do not explain how this portion of testimony supports their position, and there is no basis for concluding from this testimony that Hub City and Warren were or were not simultaneously soliciting business from these retailers. Indeed, the fact that Warren's drivers became aware of these sales by Hub City in Warren's APR would seem to suggest that Warren was also delivering beer to the same retailers in competition with Hub City.

Second, plaintiffs cite to testimony of Daniel Kramer of South Jersey Distributors, Inc. (the predecessor of defendant South Jersey) that in 1978 he requested that Miller withdraw a remote area consisting of six or eight retail licensees from its assigned APR because he "didn't feel that the difficulty in servicing that area warranted the expense of the deliveries." Despite Kramer's view that sales in this area were unprofitable, South Jersey Distributors, Inc. had continued to service half the retailers in the area. Point Pleasant had been servicing the others. Miller ultimately approved Kramer's request and reassigned the entire area to Point Pleasant. Plaintiffs paradoxically offer this evidence to support their claim that exclusive territories were established by agreement among the Miller distributors. However, rather than advancing their position, this evidence illustrates the weakness of plaintiffs' conspiracy theory. If there had been an operational horizontal conspiracy, South Jersey Distributors, Inc. could have settled the allocation of these retail accounts by agreement with Point Pleasant without notifying Miller or seeking its intervention. Indeed, such a request to the brewer is precisely the type of conduct which would be expected of a distributor desiring the realignment of a vertically-assigned territory.

The weakness of plaintiffs' argument that the extra-territorial sales of the Miller defendants reflect a horizontal realignment of the Miller APRs is highlighted as much by the evidence which plaintiffs have not

presented as by the evidence which they have presented. Plaintiffs have not offered testimony or sworn statements from any of those retailers who are in the best position to either confirm or refute the existence of intrabrand competition among the Miller defendants prior to 1983; that is, those retailers to whom the Miller defendants, such as Warren, sold Miller products outside their APRs. These individual retailers presumably would be in a position to state whether or not the distributors designated by Miller to service the retailers' areas ever actively solicited the retailers' business during the time that the retailers were purchasing Miller products from an outside distributor. These retailers also would be in a position to state whether or not their Miller-designated distributors ever refused to fill orders for Miller products during the time that the retailers were being serviced by an outside distributor. Evidence of the absence of contemporaneous sales solicitations by the distributors assigned by Miller to service the areas in which these retailers were located and/or the refusal of the designated distributors to service retailers within their brewer-assigned territories certainly would be probative of a horizontal agreement among the Miller defendants to redefine or adjust the boundaries of their respective territories and reallocate retail accounts. Plaintiffs offer no such evidence.[11]

The ultimate conclusion of horizontal conspiracy does not follow *a priori* from the facts showing that the Miller defendants sold Miller products to retailers located outside their APRs, as plaintiffs seem to suggest. These facts, without more, prove only that certain of the Miller defendants did not strictly adhere to the purported corporate policy of Miller favoring the exclusivity of its assigned APRs. As previously noted, the inference of horizontal conspiracy is only one of two equally plausible inferences which can be drawn from these facts. Plaintiffs simply ignore the possibility that the Miller defendants such as Warren who engaged in extra-territorial sales were actually competing for these sales with the other Miller defendants in whose APRs the sales were made. In doing so, plaintiffs effectively assume the very conclusion which they have the burden of proving at trial; that is, that there was an absence of intrabrand competition among the Miller defendants.[12]

In lieu of making any serious attempt to reconcile the extra-territorial sales of the Miller defendants with their theory of conscious parallelism, plaintiffs alternatively suggest that these sales constituted such a small percentage of the total sales of Miller beer by the Miller defendants as to be inconsequential. In his report, Dr. Jordan stated that "[a]s a matter of policy none of the ... Miller distributors routinely accepted orders and made deliveries to retailers located outside their APRs ... Exceptions to this policy for a given distributor, when compared to the total amount of beer that .

---

11. Plaintiffs cannot argue that they were somehow prevented from securing such evidence through the discovery process. Certain of the Miller defendants asserted in deposition testimony and answers to interrogatories that the identities of retailers located outside their APRs to whom they sold Miller products during the relevant time period were ascertainable from their business records, including customer billing invoices and sales reports. There is no suggestion in the record or in their opposition papers that plaintiffs were ever denied access to these records. In fact, Edward Goracy has stated in an affidavit that Warren produced such records in July 1985. However, plaintiffs apparently did not avail themselves of the opportunity to copy this documentation. Nor is there any suggestion in the record that plaintiffs were ever unable to obtain the cooperation of retailers.

12. Plaintiffs also appear to assume that the *only* question at issue with regard to their conspiracy claims is whether exclusive territories were established by the brewers or by horizontal agreement among the defendant distributors. By assuming the existence of exclusive territories, plaintiffs fail to address an important difference between the defenses asserted by the A–B defendants on the one hand and the Miller defendants on the other. The A–B defendants readily acknowledge that they treated the APRs assigned by A–B/St. Louis as exclusive distribution territories. The Miller defendants concede only that they concentrated their sales efforts within their respective APRs. They assert, however, that most of them did not treat these areas as being exclusive, as evidenced by their extraterritorial sales.

distributor sold, were rare, unusual, or involved small quantities of beer." These factual assumptions by Dr. Jordan are demonstrably false. While it is true that none of the Miller defendants accepted *every* order received from retailers outside their APRs, Warren, Hub City, Point Pleasant and MS & W made out-of-territory sales of Miller beer to select retailers on a regular basis. Warren, in particular, routinely sold large quantities of Miller beer to numerous retailers outside its APR throughout the relevant time period. Indeed, Dr. Jordan is able to arrive at his conclusion that "the defendants behaved as though their [Miller] APRs ... were exclusive distribution territories" only by studiously avoiding any reference to the extraterritorial sales of Warren. Warren's estimation that its extra-territorial sales accounted for "more than 5%" of its total sales of Miller beer was known by the plaintiffs at least five months before the release of Dr. Jordan's report. Dr. Jordan cites evidence regarding the sales conduct of each of the other Miller defendants, but apparently chose to deal with the evidence of Warren's extra-territorial sales by ignoring it altogether. In view of Dr. Jordan's selective disregard of significant facts, his ultimate conclusion regarding the parallel conduct of the Miller defendants is entitled to little evidentiary weight.

Plaintiffs have thus failed to generate specific facts from which a jury could reasonably infer parallel conduct by the Miller defendants in furtherance of a horizontal conspiracy to restrain intrabrand competition. The nature and magnitude of the extra-territorial sales of the Miller defendants is manifestly inconsistent with Dr. Jordan's conclusion that the Miller defendants agreed to treat their Miller-assigned APRs as exclusive distribution territories. Plaintiffs have adduced no evidence to support their alternative contention that these extra-territorial sales reflect an agreement among the Miller defendants adjusting the boundaries of their APRs. Nor have plaintiffs produced a single shred of evidence to challenge the inference that these sales were the product of intrabrand competition.

 Proof of the existence of parallel conduct is a threshold requirement to establishing antitrust liability under a theory of conscious parallelism. *See Schoenkopf,* 637 F.2d at 208. As a result of plaintiffs' failure to present evidence showing a genuine factual issue as to this essential element of their case, summary judgment on their conspiracy claims against the Miller defendants is fully warranted. As the Supreme Court stated in *Celotex:*

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

106 S.Ct. at 2553.

b. *Conduct Against Economic Self–Interest*

 The Miller defendants readily admit that they concentrated their sales efforts in their respective Miller-assigned APRs. Although Warren, Hub City, MS & W and Point Pleasant sold Miller beer to retailers located outside their APRs on a regular basis, the vast majority of their sales were made within the boundaries of their APRs. Kristen made no deliveries of Miller beer outside its APR, and only a small fraction of its total sales were made to members of co-ops located outside its APR. Trip briefly made *de minimis* sales to a single retailer outside its APR. Hub Beer, South Jersey and Garden State made no sales or deliveries outside their APRs. Even if these facts were considered to be sufficient for purposes of raising a material issue as to the parallel conduct of the Miller defendants, plaintiffs must also present evidence showing that this conduct was contrary to the economic self-interest of the Miller defendants.

As with the A–B defendants, plaintiffs argue that the Miller defendants acted against their self-interest by failing to take greater advantage of profitable sales opportunities outside their respective APRs.[13] As did the A–B defendants, the Miller defendants contend that they confined their sales to their Miller territories to the extent that they did because they were unwilling to jeopardize their long-term relationship with Miller. As with the defenses asserted by the A–B defendants, the reasonableness and plausibility of the independent business justification for refraining from more extensive extra-territorial sales proffered by the Miller defendants must be similarly evaluated by reference to evidence relating to three pertinent questions: 1) Did Miller have a corporate policy against sales by its designated distributors outside their assigned APRs; 2) How effectively was this policy communicated to the Miller defendants; and 3) Was the Miller defendants' purported fear of brewer sanctions for deviating from this policy justified under the circumstances?

With regard to the first of the above questions, Leonard Goldstein, Senior Vice-President of Marketing for Miller, testified that Miller has a longstanding policy preference that its designated distributors confine sales to their assigned territories.

> [W]e look upon our distributors, we looked upon our distributors at that time, we look upon our distributors today as a marketing extension of the brewery's effort in each area of the State of New Jersey, that is, in each area of primary responsibility ... [W]e felt very strongly that it was to our mutual benefit for [our distributors] to confine their efforts to their area of primary responsibility

This policy preference for territorial exclusivity was unmistakably conveyed in the 1983 Miller Distributor Agreements. Under these agreements, each distributor was contractually bound not to "sell or supply Miller products within another authorized Miller distributor's area." The fact that this policy substantially predated 1983 is evident in the contracts between Miller and certain of the Miller defendants which were executed prior to the Supreme Court's decision in *Schwinn*. In 1953, Kristen entered into a contract with Miller which specified that "[t]he Distributor is to (a) sell and promote the sale of Miller [products] ... in the [territory described in Exhibit A to the agreement] to the satisfaction of Miller; ... and (g) not sell outside such territory ... without the prior written approval of Miller." This contract was superseded by a letter agreement dated May 3, 1954 which stated that "[Miller] will sell to [Kristen] Miller beer for resale in the territory described at the end of this letter with the understanding that [Kristen] will expend [its] best efforts in distributing and selling the same in such territory." This agreement remained in effect until 1983. Garden State entered into an identical letter agreement with Miller also dated May 3, 1954. Hub City similarly entered into an agreement with Miller in 1955 which obligated Miller only to sell Miller products to Hub City "for resale in the [contractually designated] territory." These contractual provisions clearly reflect Miller's desire and expectation that the distributors confine their sales of Miller products to the assigned areas.

There is no evidence that Miller modified its policy favoring territorial exclusivity following the release of the *Schwinn* decision in 1967. However, the evidence suggests that in the wake of the *Schwinn* decision Miller was generally more cautious than A–B/St. Louis in its efforts to communicate this policy preference to its designated distributors. Miller was not only less insistent than A–B/St. Louis that its distributors refrain from extra-territorial sales, but the substance of its oral and written communications with the Miller defendants regarding such sales was more equivocal in nature.

---

**13.** Plaintiffs attribute the same conduct described in Section V.A.1.c. of this opinion to both the A–B and Miller defendants and the description of this conduct will not be repeated here. In addition, the law and commentary thereon set forth in Section V.A.1.c. is fully applicable to the present discussion and will not be reiterated.

Unlike the contracts between Miller and Kristen, Garden State and Hub City, the Miller contracts with other of the Miller defendants executed subsequent to the *Schwinn* decision did not limit the resale of Miller products by the distributors to their assigned territories and did not specifically obligate the distributors to expend their best efforts *within* such territories. Indeed, the agreements signed by MS & W in July 1977, by Warren in June 1980 and by South Jersey in December 1981 each contained the following language in paragraph 1(i) under the heading "Distributor's Area":

> Nothing herein shall be deemed to restrict Distributor as to where or to whom Distributor may resell Miller beer. The area described is not to be regarded as being exclusively Distributor's "territory" unless so required by applicable law or regulation.

In its oral communications with the Miller defendants, Miller similarly disclaimed any intention of imposing exclusive distribution territories on its designated wholesalers. Thus, while Leonard Goldstein testified that he "personally recommended" to Miller distributors that they confine their marketing efforts to their assigned areas, he further stated that "the people who reported to me would state to a distributor that as independent business people they could sell [Miller] beer wherever their licenses allowed them to." [14] The Miller defendants themselves uniformly testified that they were never told by anyone from Miller that they were not permitted to sell Miller products outside their assigned territories or that they would be penalized by Miller for doing so. In fact, Warren stated in answers to plaintiffs' interrogatories that "prior to May, 1983, Miller communicated on numerous occasions that they did not intend to restrict Warren from selling outside its territory." Unlike the A–B defendants who uniformly asserted that they

were restricted by A–B/St. Louis from engaging in extra-territorial sales, all but two of the Miller defendants (excluding Kristen and South Jersey) stated that they were not so restricted by Miller.

Plaintiffs conclude from this evidence that Miller did not care whether the Miller defendants sold Miller products outside their APRs. The record, however, does not permit such a broad generalization. While Miller clearly did not insist that the Miller defendants treat their assigned APRs as exclusive distribution territories, the evidence demonstrates that Miller fully expected its designated distributors to concentrate their merchandizing and marketing efforts within their respective areas and communicated this expectation to the Miller defendants in no uncertain terms.

Miller continually stressed to the Miller defendants the importance of upgrading their sales and servicing performance within their assigned territories. In particular, Miller representatives maintained on-site monitoring of each distributor's performance on an ongoing basis throughout the year. For example, Edward Goracy testified that Miller performed quarterly and annual reviews of Warren's performance during which it evaluated and rated "every facet of [Warren's] operation." Leonard Goldstein emphasized that each distributor's performance was judged solely on the basis of its efforts within its assigned territory. The contracts of MS & W and Warren expressly provided that "[t]he purpose of setting forth ["Distributor's Area"] is to establish a location wherein Miller can make a determination as to Distributor's performance of the obligations assumed by Distributor hereunder." Miller considered a broad range of factors in rating the performance of each distributor, including the total volume of sales within the distributor's area, the total number of active retail

14. There is evidence that at least on one occasion Miller unambiguously directed one of the Miller defendants to refrain from selling a Miller product outside its assigned territory. Point Pleasant originally sold Lowenbrau beer as an import in a territory slightly larger than its Miller territory. When Miller purchased the rights to Lowenbrau and began brewing Lowenbrau in its own breweries in 1978, Miller instructed Point Pleasant to discontinue its sales of Lowenbrau outside its APR. Point Pleasant complied with this explicit direction from Miller.

licensees being serviced by the distributor within its area, the suitability of the distributor's warehousing facilities, the maintenance by the distributor of proper inventory levels, the number of marketing and sales personnel employed by the distributor, the condition of the distributor's delivery trucks bearing Miller brand markings, and the frequency and quality of the distributor's promotional activities and co-op advertising. Miller also expected its distributors to provide a wide array of services to their retail accounts, including weekly sales solicitations, 24–hour deliveries on a weekly basis at times convenient to retailers, unloading and stacking delivered products, stock rotation, removing and replacing overage or damaged products, and supplying and positioning point-of-sale advertising materials.

The evidence further shows that Miller often found reasons to be critical of the Miller defendants' performance within their assigned territories, and repeatedly demanded that the distributors implement certain corrective measures to improve their overall performance. Frank Tripucka testified:

> [Miller] constantly monitor[s] [Trip's] selling performance ... [T]hey'll sit there and tell you that ... we feel that you should have another sales manager. You should have additional trucks. You should have a new warehouse ... You should have another merchandizing manager, right on down the line. Every one of these things are evaluated.

Tripucka further stated in an affidavit submitted in support of the present summary judgment motion:

> Miller only judges Trip on its performance in Trip's area assigned by Miller. They constantly criticize our operations. They are always alleging there are not enough management, sales or marketing people to service our existing territory. Whenever Trip would react to one of the criticisms of Miller ..., further criticisms would develop. In other words, Miller constantly demands improved performance.

There is additional evidence that the Miller defendants were sensitive to the performance ratings they received from Miller, and affirmatively responded to Miller's criticisms. For example, by lowering annual performance ratings, Miller was able to pursuade Garden State, Kristen and Warren to hire additional personnel. Agnes Kristen testified:

> Q: Did you increase your sales force after you received that less than satisfactory rating from the brewery?
>
> A: Yes, I did.
>
> Q: Do you recall how much you increased your sales force?
>
> A: I added sales supervisors, I added merchandizing people, I added two salesmen.

Miller similarly prompted Kristen to undertake the major capital expense of upgrading its warehouse by rating Kristen's warehousing facilities as less than satisfactory. Miller was equally as capable of using the carrot as the stick to induce the Miller defendants to improve their ability to service their assigned territories. In 1981, Miller offered to expand Trip's assigned APR to include all of Passaic, Bergen and Hudson counties, but insisted that Trip construct a temperature controlled warehouse as a pre-condition to assigning Trip the additional territory. Trip, like Kristen, made this major capital expenditure with no financial assistance from Miller.

Miller's attitude toward extra-territorial sales by its distributors, as reflected in its equivocal oral and written communications on the subject together with its preoccupation with the distributors' performance within their assigned territories, was susceptible of several equally plausible interpretations by the Miller defendants. Notwithstanding the view of most of the Miller defendants that they were not absolutely restricted by Miller from selling outside their assigned territories, the Miller defendants could have reasonably concluded that Miller would tolerate such sales only if their sales and merchandizing performance within their territories was satisfactory to Miller. Warren, in particular, appears to have adopted this view of its relationship

with Miller. Warren engaged in substantial sales of Miller products to members of co-ops and other retailers outside its APR throughout the relevant time period. Warren nevertheless gave priority to servicing retailers within its APR. During periods of peak demand, Warren dramatically reduced the volume of its extra-territorial sales in order to conform to Miller's inventory requirements and assure an adequate supply of Miller products to retailers within its assigned area. Although Miller apparently never overtly complained to Warren about the volume of its extra-territorial sales, Edward Goracy testified that Warren was required on at least one occasion to focus greater attention on its sales and merchandising efforts within its APR in response to an unsatisfactory rating by Miller for failing to maintain proper inventory levels and meet Miller's sales projections and timetables for Warren's area.

Other of the Miller defendants could have just as reasonably concluded that Miller would not have placed such emphasis on the distributors' performance within their assigned territories unless Miller expected them to confine their sales efforts to these territories. Charles Formosa of Hub Beer, which never sold Miller products outside its Miller-assigned area, stated:

> The message was clear to me that Miller, although technically not restricting Hub Beer from selling outside of its territory, would not be happy if we did so and felt that we could not do a satisfactory job in our territory if we sold out of territory.

■ The evidence suggests that the Miller defendants had good reason to believe that extra-territorial sales might jeopardize their ability to service their assigned areas in a manner which would be satisfactory to Miller. There is testimony by Leonard Goldstein and statements by Frank Banko to the effect that during the 1970's and until 1981 and during periods of peak demand thereafter Miller did not always have sufficient beer production to provide its distributors with as much beer as they were capable of selling. During such periods, Miller strictly allocated its products among its distributors and, if necessary,

cut the orders received from particular distributors. The allocation of each distributor was derived from projected sales to retailers within the distributor's assigned area only. Thus, during such periods of allocation, a distributor's extra-territorial sales necessarily cut into inventory allocated for sales to retailers located within the distributor's APR. As previously noted, Warren was forced to cut back on its extra-territorial sales during summer months because it would not get enough beer from Miller to satisfy retailer demand both inside and outside its APR. Warren's conduct directly contradicts plaintiffs' main contention that the Miller defendants unjustifiably declined to make profitable sales outside their APRs. The fact that Warren was forced to actually reduce its extra-territorial sales during peak demand periods suggests that Warren was taking maximum advantage of sales opportunities outside its APR subject to the availability of Miller products in excess of what it needed to satisfy retailer demand within its APR.

Hub City was confronted directly by Miller with the prospect of running out of Miller products as a result of sales Hub City was making in New York State. Both Leonard Goldstein and James Sigler, General Manager of Hub City, testified about a conversation they had regarding Hub City's sales of Miller products into New York. Hub City had originally begun selling in New York with Miller's approval. Miller subsequently rescinded its approval and advised Hub City to discontinue these sales. Hub City nevertheless continued to sell into New York State. In a conversation with Sigler several months after Hub City was supposed to have ceased its New York sales, Goldstein told him that Miller knew that Hub City was continuing to make such sales. Goldstein testified:

> I wanted to make him aware of the fact that we held him responsible only for his performance in his area of primary responsibility. I said ... that you have to keep a certain amount of inventory on your floor to supply retailers within your [APR]. If we're in an allocating position or shipping beer in the middle of the summer, I certainly am not going to pro-

vide him with beer that's reflective of him transshipping beer to another area, because I have to make sure he has his beer in [his APR] and based on his forecasted ... sales in that area. He can do it out of his area, but if he doesn't cover ... [his assigned] area, we're going to have a big problem.

Sigler similarly stated:

[Goldstein] told me that he knew that Hub City was making the New York sales; he reminded me that we were on allocation and that everyone was on allocation; and that the allocation was measured in terms of sales in [Hub City's] territory, not New York sales. He indicated that if Hub City ever ran out of beer in its territory to service its customers because of making the New York sales, Miller would look very seriously upon it.

According to Sigler, Hub City stopped making sales into New York as a direct result of this conversation.

Dr. Jordan conceded that just such a conversation would be an incentive for a distributor to confine its sales to its territory. He testified:

Q. Assume that a distributor is selling outside its territory and is told by the brewer that it might ... not be given a full allocation of beer if it continues to do that, do you think that would be an incentive for that distributor to confine its sales to its territory? ...

A. I would agree with you, that if the distributor felt that it was not going to have sufficient beer to sell, that certainly would be a consideration as to whether or not it would sell outside its area of primary responsibility.

Charles Formosa of Hub Beer noted that he "learned the general thrust of the conversation" between Goldstein and Sigler, and that this knowledge "certainly affected [his] decision on behalf of Hub Beer to continue to confine sales to [its assigned] territory ...." Dr. Jordan acknowledged that a distributor, such as Hub Beer, would be justified in refraining from making sales outside its APR after learning the substance of the conversation between Goldstein and Sigler.

There is further evidence that the Miller defendants independently evaluated whether expanding sales outside their assigned territories might impair their ability to satisfy Miller's expectations regarding the distributors' in-territory performance. As were other of the Miller defendants, including Trip, Warren and Hub City, Kristen was invited by Miller to make sales of Miller products into New York State during a time when Miller was not directly supplying New York distributors. Unlike the other New Jersey distributors, Kristen declined the invitation preferring instead to concentrate its efforts on servicing retail accounts within its territory. Agnes Kristen explained the rationale for this decision:

At that time Kristen's management chose not to make these sales as it was feared that to do so would disrupt the marketing practices and procedures we maintained to assure proper service of our in-area accounts. We believed that any effort out-of-area could cause us to have problems in our next Miller annual review, which would not take into account our increased sales in New York. Although we were aware that sales to New York accounts could yield high, short term profits, we chose to forego these profits in favor of protecting our long term relationship with our in-area accounts.

The record on the present summary judgment motion further supports the inference that it was in the long-term economic self-interest of the Miller defendants to maintain a level of performance within their assigned territories which was satisfactory to Miller. Miller certainly enjoyed as much economic leverage over the Miller defendants as did A–B/St. Louis over the A–B defendants. Miller's contracts with the Miller defendants were terminable at will or for cause. Miller also retained the right to appoint a competing distributor in an existing distributor's territory. Dr. Jordan acknowledged that such an action by Miller could amount to an "effective termination."

Under their contracts with Miller, the Miller defendants were obligated either to expend their "best efforts in distributing or selling" Miller products or to "market and promote actively and aggressively the sale of Miller beer." As plaintiffs' economic experts conceded, Miller was the final arbiter as to whether the Miller defendants were satisfying these vague contractual requirements. The extent of Miller's discretion with regard to measuring distributor performance and exercising its termination rights clearly placed the Miller defendants in a vulnerable economic position. As James Sigler stated:

In my view, Hub City always did a good job in its primary area, but Miller nevertheless regularly graded Hub City at just the satisfactory level. I was always concerned that if Miller wanted to find something wrong, it could do so by simply letting the rating slip in one or two areas, thus bringing the entire rating below satisfactory and endangering the whole franchise.

The vulnerability of the Miller defendants was accentuated by the fact that the sale of Miller products by each of the Miller defendants except Warren represented between 80% and 90% of their total sales during the relevant time period. Approximately half of Warren's total sales were attributable to Miller products. Under these circumstances, the loss of their right to distribute Miller products would have had a potentially devastating impact on the business of each of the Miller defendants.

The risk of sanction by Miller for the failure of a distributor to maintain a level of performance satisfactory to Miller was neither illusory nor hypothetical. Indeed, the Miller defendants had ample reason to believe that a poor performance rating of a distributor could result in termination of its contract with Miller or the appointment by Miller of a competing distributor in its territory. In 1975, Miller specifically appointed Warren to sell Miller products in the territory of another designated distributor, the Carlo Gelardi Distributing Co. ("Gelardi"). Leonard Goldstein testified:

[Miller was] very much concerned about a rapid deterioration of [Gelardi's] performance in [its] area of primary responsibility. In our regional office in New York we were receiving a proliferation of phone calls from retailers about very poor service. [Gelardi] was not able to pay [Miller] on time for the beer that [it] received. [Gelardi] had a very poor experience with us as far as maintaining required inventory. [Gelardi] had indicated to us that [it] was shipping beer out of [its] territory.

Miller subsequently terminated its distributorship agreement with Gelardi in 1976, leaving Warren as the sole distributor of Miller products in the area. *See generally, Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637 (D.N.J.1980). Gelardi subsequently went out of business. In addition to Warren, Kristen and Hub City knew that Gelardi sold Miller products outside its APR, that Miller appointed Warren to serve the same area as Gelardi, and that Gelardi was ultimately terminated by Miller and was no longer in the beer distribution business. Dr. Jordan acknowledged that Miller distributors who were aware of Miller's actions against Gelardi could have reasonably concluded that these actions were taken as punishment for Gelardi's sales outside its APR and its resultant inability to adequately service its territory to the satisfaction of Miller.

The evidence presented on the present summary judgment motion supports a conclusion that the Miller defendants were responding to the vertical direction of Miller when they refrained from engaging in more extensive extra-territorial sales. Unlike A–B/St. Louis, Miller did not expressly direct the Miller defendants to confine their sales of Miller products to their respective APRs, and the evidence correspondingly shows that, unlike the A–B defendants, most of the Miller defendants did not treat their assigned APRs as exclusive distribution territories. Miller did, however, impress upon the Miller defendants the importance of maintaining a level of performance within their APRs which was satisfactory to Miller, and the evidence correspondingly shows that each of the Miller defendants concentrated its merchandising and mar-

keting efforts within its APR and took steps to assure that any extra-territorial sales it made would not interfere with these efforts. Lastly, Miller had considerable discretion in terms of evaluating the adequacy of a distributor's performance within the distributor's APR and in terms of exercising its powers of appointment and termination, and the evidence correspondingly shows that the Miller defendants repeatedly adjusted their business behavior in response to the criticisms, demands and expectations of Miller.

There is also an abundance of evidence to support the inference that each of the Miller defendants independently evaluated its own long-term business relationship with Miller and the potential risks to that relationship in deciding whether to and how much to sell out of area. Kristen, Garden State and Hub City were subject to virtually identical contractual agreements with Miller, yet Hub City routinely sold Miller products outside its APR, whereas Kristen made no extra-territorial deliveries of Miller beer and Garden State neither sold nor delivered Miller products outside its APR. Similarly, despite identical contracts with Miller, Warren engaged in extensive extra-territorial sales while South Jersey made none. In a different yet equally significant vein, Miller invited four of the Miller defendants to make sales in New York State, but only Kristen declined the invitation. The disparate behavior of the Miller defendants is precisely what would be expected of independent businesses making independent decisions in accordance with their perceived economic self-interest. Indeed, the very fact that there was such variation among the Miller defendants in terms of extra-territorial sales strengthens the inference that they were separately evaluating the extent to which they could engage in such sales while continuing to service their assigned territories in conformity with Miller's expectations

In short, the Miller defendants have offered sound business reasons for confining sales to their respective APRs, to the extent that they did. Thus, even if plaintiffs could prove that the Miller defendants did not take advantage of profitable sales opportunities outside their assigned territories, this proof would be insufficient to allow a jury to find action in contradiction of the Miller defendants' economic self-interest. Each of the Miller defendants is entitled to summary judgment on plaintiffs' conspiracy claims.

### B. *Proof of Impact*

Under the second essential element of proof in a Section 1 case, antitrust plaintiffs must produce sufficient evidence from which the trier of fact can infer a causal connection between the alleged antitrust violation and the injury plaintiffs are alleged to have sustained. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777 (1962). As the Supreme Court has stated:

> [Plaintiffs] must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Summary judgment is appropriate if antitrust plaintiffs fail to present specific facts which tend to show that the alleged anticompetitive acts were a material cause of injury to plaintiffs' business or property.

> [T]here are patently justifiable reasons why a trial court should ascertain, before embarking on a lengthy antitrust trial, whether plaintiff will be able to present some evidence that the injury of which it complains can be attributable to the alleged antitrust violation.

*Out Front Productions, Inc., v. Magid*, 748 F.2d 166, 170–71 (3d Cir.1984), *citing Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 258 (3d Cir.1980) (Sloviter, J.,

concurring), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

The only form of antitrust injury to their business or property that plaintiffs have alleged in this action is that plaintiffs "have been required to pay higher prices for beer which they have purchased ... from the defendant distributors" as a result of the horizontal agreements to maintain exclusive distribution territories. In support of their present summary judgment motions, the A–B and Miller defendants contend that high levels of interbrand competition effectively precluded any anticompetitive effects on the wholesale pricing of A–B and Miller products that could have potentially resulted from the elimination of intraband competition through exclusive distribution territories.

The Supreme Court has recognized that exclusive territories are not inherently anticompetitive. In *Sylvania,* the Court analyzed the relationship between interbrand and intrabrand competition and noted that interbrand competition can minimize and under certain circumstances neutralize the potential anticompetitive effects of exclusive territories.

Interbrand competition is the competition among the manufacturers of the same generic product ... and is the primary concern of antitrust law.... In contrast, intrabrand competition is the competition between the distributors— wholesale and retail—of the product of a particular manufacturer.

The degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer. Thus, there may be fierce intrabrand competition among the distributors of a product produced by a monopolist and no intrabrand competition among the distributors of a product produced by a firm in a highly competitive industry. But when interbrand competition exists, ... it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.

433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. Thus, the critical question in the present case is whether interbrand competition among distributors of beer in New Jersey served as an effective substitute for intrabrand competition and prevented the A–B and Miller defendants from artificially raising the wholesale price of beer to retailers above competitive levels.

The ability of a business entity to unilaterally raise its prices above competitive levels is typically referred to as "market power." [15] As then Professor, now Judge Posner has explained:

The absence of market power in the interbrand market implies that the defendant is in competition with firms that sell products regarded as close substitutes for the defendants. The defendant therefore will lose most or all of its sales if its retail price exceeds its competitors' retail price for any reason ... [I]f a firm lacks market power, it cannot affect the price of its product; that price is determined by the market.

Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 16 (1981), *quoted in Graphic Products Distributors v. Itek Corp.,* 717 F.2d 1560, 1569 (11th Cir.1983). Market power is not something a given firm simply has or does not have, but rather is a matter of degree. As Professor Areeda has noted:

The degree of market power may be extremely small, as when any more than a slight increase in price would lead to an unacceptable loss of sales. It is substan-

---

**15.** The concept of market power has typically been applied in monopolization cases brought under § 2 of the Sherman Act, *see, e.g., United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), merger cases under § 7 of the Clayton Act, *see, e.g., United States v. Philadelphia Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and post-*Sylvania* cases under § 1 of the Sherman Act challenging verti- cal geographic restraints under a rule-of-reason analysis, *see, e.g., Assam Drug Co., Inc. v. Miller Brewing Co., Inc.,* 798 F.2d 311, 315–17 (8th Cir.1986). However, the market power concept is equally applicable in analyzing the potential for monopoly pricing of A–B and Miller products in the wholesale malt beverage market in New Jersey by the defendants in this case.

tial where a firm can raise price substantially without a significant profit decline resulting from competitors' increased output or lower prices or from consumer resistance at the higher price.

Areeda, *supra.* ¶ 501 at 322–23. For purposes of the present discussion, "market power" will be used to refer to the ability of the defendants to effect a unilateral price increase without having the profit realizable from the price increase offset by a corresponding decline in consumer demand. For plaintiffs to show that interbrand competition in the wholesale malt beverage market in New Jersey was not a complete substitute for intrabrand competition, plaintiffs must present facts which support the inference that the A–B and Miller defendants had sufficient market power to implement and profit from unilateral price increases above competitive levels.

Several economic factors are particularly relevant in determining the market power of antitrust defendants.

Market power ... is a function of one or both of two principal interrelated economic criteria—market share and product differentiation. The market share of the product on which the intrabrand restraint is imposed and the degree to which that product is insulated from competition by product differentiation directly relate to the effectiveness of interbrand competition in minimizing the effects of the restraint on intrabrand competition.

ABA Antitrust Section, Monograph No. 2, *Vertical Restrictions Limiting Intrabrand Competition*, 62–63 (1977) (hereafter referred to as "ABA Monograph").

With regard to the first of these factors, if a particular brand has a small share of the relevant market, restraints on competition among sellers of that brand are not as likely to lead to anticompetitive effects on overall competition as they would if the brand commands a substantial share of the market. "[A] substantial market share suggests that interbrand competition may not be an effective competitive check." *Id.* at 63. The degree of market concentration

is also a relevant consideration in determining whether interbrand competition is likely to serve as an effective substitute for intrabrand competition.

[T]he existence of competing producers of identical products will not insure the absence of effective market power if the number of producers is so few that each elects to abide by a non-competitive price and share in the resulting monopoly profits—the oligopoly case.

Areeda, *supra,* at ¶ 504a; *see also* ABA Monograph at p. 64.

With regard to the second factor of product differentiation, Judge Learned Hand noted that "substitutes are available. for almost all commodities, and to raise the price enough is to evoke them." *United States v. Aluminum Company*, 148 F.2d 416, 426 (2d Cir.1945). Product differentiation can be characterized as the extent to which different brands of the same products are regarded by consumers as substitutes for one another. Products differentiation is a function of consumer perceptions of brand quality and desirability which are influenced by styling, packaging, advertising, servicing and other forms of non-price competition. *See* ABA Monograph at p. 64. The level of product differentiation will depend on how close the substitutes are in the minds of consumers and how many consumers consider them to be close. *See* Areeda, *supra,* at ¶ 504b. This market phenomenon is measured in terms of cross-elasticity of demand; that is, the responsiveness of the sales of a product brand to price competition from other brands. *See* ABA Monograph at p. 65. If there is a low level of product differentiation with respect to a particular product within a defined market (i.e., a low level of consumer brand loyalty to A–B and/or Miller beer product in New Jersey), then an increase in the price of a particular brand above competitive levels would result in a corresponding reduction in demand for that brand as consumers shift to other brands. In such a circumstance, the producer or distributors of that brand would lack significant market power, and "interbrand price competition can be considered effective." *Id.*

A number of courts have focused entirely on the market share of a product brand subject to restraints on intrabrand competition as the sole determinant of whether the manufacturer of the brand has market power. *See, e.g., Assam Drug Co., Inc. v. Miller Brewing Co., Inc.,* 798 F.2d 311, 318–19 (8th Cir.1986); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982). As noted by the Eleventh Circuit:

> Market share is frequently used in litigation as a surrogate for market power for two reasons. First, market power is conceptically difficult to define in any given case. Second, its measurement requires sophisticated econometric analysis.

*Graphic Products Distributors, Inc. v. Itek Corporation,* 717 F.2d 1560, 1570 (11th Cir.1983). Although market share calculations have the advantage of being easily quantifiable, reliance on this singular economic indicator of market power appears to be misplaced. Prof. Timothy Bresnahan, another of plaintiffs' economic experts has noted:

> [M]arket shares are misleading indicators of firm market power in the brewing industry ... [M]arket share is a poor indicator of firm market power in a product differentiated industry because there is no reason to expect that the firms with the largest shares of industry sales will also have the greatest fraction of inframarginal customers ... [A] small firm can have a substantial amount of market power while, at the same time, a large firm can have little or no market power.[16]

Bresnahan, *An Analysis of the Competitive Effects of a Heileman–Pabst Merger,* 4, 7 & 9 (November 16, 1984); *see also* Areeda, *supra,* ¶ 507. Thus, in order to determine the market power of the A–B and Miller defendants, evidence relating to both market share and product differentiation should be independently evaluated.

### 1. Market Share

■ A market share analysis of beer sales in New Jersey between 1979 and 1982 strongly suggests that Miller and the distributors of its brands were without significant market power. During this time period, the market share of Miller beer brands ranged from 21.1% to 17.3%. The Eighth Circuit has recently held that a market share of 19.1% of the South Dakota interbrand beer market did not confer market power on Miller. *Assam Drug Co., Inc.,* 798 F.2d at 318–19; *see also Donald B. Rice Tire Co,* 483 F.Supp. 750 (D.Md.1980) (20–25% market share does not constitute market power), *aff'd,* 638 F.2d 15 (4th Cir. 1981), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *O.S.C. Corp. v. Apple Computer, Inc.,* 601 F.Supp. 1274 (C.D.Cal.1985) (up to 20% market share does not constitute market power where substantial competition exists), *aff'd,* 792 F.2d 1464 (9th Cir.1986). Of equal significance is the fact that Miller's market share was steadily declining during the relevant time period (21.3% in 1979, 19.6% in 1980, 18.4% in 1981, and 17.3% in 1982). As noted by the ABA section on Antitrust Law, "a declining market share ... would appear to indicate a reduced need for intrabrand competition, because the effectiveness of interbrand competition is clearly established." ABA Monograph at 63.

A review of the market share enjoyed by A–B during this time period is less conclusive. Between 1979 and 1982, the market share of A–B brands ranged from 45% to 48.4%. Although substantial, such large shares of the New Jersey beer market does not necessarily reflect *per se* market power. *See Graphic Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560, 1568–71 (11th Cir.1983) (70–75% market share is indicative of market power where only a small number of competing firms divided the remaining 25–30%). Indeed, during the relevant time period, A–B's market share was steadily inceasing (45% in 1979, 46.9% in 180, 47% in 1981 and 48.4% in 1982).

---

**16.** Under Bresnahan's analysis, marginal customers are those who will readily switch to substitute brands of a product in reaction to a price increase. Inframarginal customers, by contrast, are those who more strongly prefer the brand and will switch to substitutes only at higher price increases.

Even assuming that A–B and its distributors enjoyed some degree of market power with such large shares of the market, it is unlikely that A–B could have captured progressively larger shares of the beer market if its distributors were simultaneously setting the prices of A–B brands above competitive levels. One of the economic experts of the A–B defendants, Dr. Myslinski, has noted that "[i]ncreasing market share of a leading firm is also consistent with aggressive price and non-price competition. If prices are above competitive levels, the leading firm will lose market share over time." Myslinski Report at 40, *citing G.J. Stigler*, "a Theory of Oligopoly," J. Pol. Econ. (Feb. 1964), and R.A. Posner, *Antitrust Law: An Economic Perspective*, 62 (1976).

Plaintiffs argue that the combined market shares of the A–B and Miller defendants are the correct index of market power. Although plaintiffs have abandoned their claims regarding a joint conspiracy among the A–B and Miller distributors to maintain exclusive distribution territories, they contend that the existence of parallel conspiracies to restrain intrabrand competition enabled the A–B and Miller defendants to increase the price of their respective brands higher than they could have if only one group of distributors had entered such a conspiracy. In support of this proprosition, plaintiffs rely on a so-called "feedback theory" advanced by Bresnahan and Stiglitz. According to plaintiffs' experts, the existence of similar conspiracies among distributors of the two leading brands in New Jersey removes much of the restraining influence on price that each group of distributors would otherwise exert on the other group's prices. Stiglitz Report at 9; Bresnahan II Report at 22–23. Thus, after these feedback effects have worked, the prices of both brands will finally be higher than either of them would have been if only the distributors of one brand had conspired to maintain exclusive territories.

Plaintiffs' experts do not offer any empirical evidence or cite to any empirical studies to support their feedback theory. They do not provide a pricing history of A–B or Miller products in New Jersey showing a pattern of corresponding price increases. Nor have they produced any evidence that the wholesale price of A–B and Miller brands increased disproportionately to the price of beer generally or the wholesale price of other brands in particular.[17] Dr. Myslinski asserts that plaintiffs' "feedback effect" is neither obvious nor inevitable as a matter of economic theory.

> In addition to responding to an increase in a competitor's price with a price increase of its own, it is also possible that consumer sensitivity to price changes may dictate that a firm's best strategy could be either to leave its price unchanged or to lower its price so as to pick up even more of its competitor's former customers.

Myslinski Report at 69. Indeed, under the circumstances of this case, it would have been economically irrational for the Miller defendants to have acted in a manner consistent with plaintiffs' "feedback effect" theory. It is unlikely that the Miller defendants would have followed non-competitive price increases in A–B brands at a time when the market share of Miller brands was declining. Rather, it is more probable that the Miller defendants would have taken advantage of the opportunity to recoup lost market share by resisting such increases and maintaining the prices of Miller beer at competitive levels.

Absent facts supporting plaintiffs' "feedback effect" theory, the separate market shares of Miller and A–B brands in the New Jersey beer market are the appropriate percentages to be considered in assessing the respective market power of the Miller and A–B defendants. These market shares standing alone do not support a conclusion that the Miller and A–B defendants had sufficient market power to effect unilateral price increases above competitive levels without suffering an offsetting decline in consumer demand.

---

**17.** Nor do Bresnahan or Stiglitz attempt to argue that there was oligopolistic pricing behavior among distributors of all brands of beer in New Jersey.

## 2. Product Differentiation

The A–B and Miller defendants have produced considerable evidence from which it can reasonably be inferred that customer loyalty to the A–B or Miller brands, to the extent that it existed, was extremely shallow and that the level of product differentiation at the consumer level in New Jersey was so low as to preclude the A–B and Miller defendants from exercising market power over the pricing of their respective products. In particular, defendants' economic experts have presented precise statistical data which tends to show: (1) that the overall market share of A–B and Miller brands in New Jersey shifted dramatically between 1978 and 1982, *see* Myslinski Report at 43;[18] (2) that the relative shares of sales of competing A–B and Miller brands by competing A–B and Miller distributors were highly unstable between 1978 and 1982, *see* Myslinski Report at 43–44; (3) that New Jersey retailers were extremely sensitive to changes in the wholesale price of A–B brands and adjusted their purchasing behavior accordingly, *see* Myslinski Report at 44–50;[19] and (4) that during the relevant time period there were significant monthly and tri-monthly fluctuations in market share between competing A–B and Miller distributors beyond what one would find from monthly price promotions, *see* Finneman Aff., ¶¶ 32–40 and Tables 3, 3A and 4. This data supports the conclusions of defendants' economic experts that there was intense interbrand competition in the New Jersey wholesale malt beverage market during the relevant time period and the price elasticity of demand for Miller and A–B brands at the retailer and consumer levels of this market in New Jersey was such that the Miller and A–B defendants were effectively precluded from raising wholesale prices above competitive levels.

Defendants further note that these conclusions were corroborated by virtually every retailer that has testified in this action. For example, Frank E. Gibson testified:

> I'm sure that one month Miller gives a discount and the next month Budweiser gives a discount. The consumers are very aware of it today. The loyalty to products is gone. If you put Anheuser–Busch out on sale they buy Aneuser–Busch. If you put Miller out on sale, they will buy Miller.... It's taken a few years since this deregulation, but now the public is extremely aware of price, extremely.

Plaintiffs and their experts have not attempted to refute the data presented by defendants' economic experts. Rather, plaintiffs' economic experts rely on theoretical assumptions regarding the market power of the A–B and Miller defendants in the absence of intrabrand competition for which they provide very little factual support. In particular, Drs. Stiglitz and Bresnahan conclude on the basis of broadly-defined economic principles that the elimination of intrabrand competition resulting from exclusive distribution territories (whether vertically or horizontally imposed) will always result in reduced competition and higher prices for the brand in question.

Bresnahan insists in his second report that "[i]f raising the price of either of the two brands above its competitive level while leaving the prices of all other brands at their competitive level would not make demand for that brand fall to zero, then interbrand competition alone will lead to higher prices than intrabrand competition." Bresnahan II at 21. In effect, Bresnahan assumes that for interbrand competition to be a complete substitute for intrabrand competition, any price increase of a particu-

---

**18.** The Federal Trade Commission noted in a 1978 study that "large changes in market shares in many states are evidence," that consumers of beer apparently do not "display a great deal of brand loyalty." Bureau of Economics, Federal Trade Commission, *The Brewing Industry* at 130 (1978).

**19.** For example, in Table 7 in his report, Myslinski shows the percent of 1982 volume for Budweiser 12 ounce can/six packs sold by each A–B

distributor in New Jersey during promotional price months as follows:

| Distributor | Percent | |
|---|---|---|
| Crown | 60.2 | (1981) |
| Harrison | 35.5 | |
| High Grade | 54.3 | |
| Konrad | 42.1 | |
| A–B Newark | 46.7 | |
| Ritchie & Page | 36.3 | |

lar brand above competitive levels would have to reduce consumer demand for that product to zero; that is, there must be no product differentiation at the consumer level. He does not attempt to justify such an extreme assumption nor explain why a total absence of consumer brand loyalty is necessary for interbrand competition to be effective. Common sense would seem to suggest otherwise. As a matter of simple logic, it would follow that no rational businessperson would increase prices above competitive levels if even a slight increase would cause enough consumers to shift to other brands so that the loss of sales more than offset the profit to be derived from the price increase. There is no reason to assume that a total withdrawal of consumer demand is necessary to deter such noncompetitive pricing. Indeed, in a previous work Bresnahan acknowledged that "[t]o an economist, a firm has market power only if it is able to raise price without losing so many sales as to cause the price increase to reduce sales revenue." Bresnahan, An analysis of the Competitive Effects of a Heileman–Pabst Merger 26 & 27 (November 1984). Bresnahan makes no attempt to show in his present report that such a reduction would not have occurred if the A–B or Miller defendants raised the wholesaler prices of A–B or Miller brands above competitive levels. Indeed, in two prior studies of competition in the brewing industry (including the one cited above), Bresnahan's analysis supports just the opposite conclusion.

In his analysis of the proposed Heileman–Pabst merger, Bresnahan concluded that there was intense interbrand competition in the brewing industry. *Id.* at 1.[20]

Bresnahan further noted that a marketing study conducted by the G. Heileman Brewing Company had shown that "many Miller High Life drinkers are marginal" (i.e., many of the purchasers of the flagship Miller brand would switch to other brands if the price of Miller High Life were increased above competitive levels). Id. at 19. Brenahan also observed that "it appears that enough customers of A–B's brands are marginal with other firms' brands so that the rest of the industry as a whole constrains A–B from exercising market power ..." *Id.* at 31. In a separate study, Bresnahan and a co-author concluded that A–B had no market power at the consumer level over the twenty year period of 1962–82:

> Anheuser–Busch had some market power in the early part of the sample, but lost all its market power when Miller introduced a light beer nationwide in 1975 ... Miller's innovation destroyed that market power.

J. Baker & T. Bresnahan, *Estimating the Elasticity of Demand Facing a Single Firm: Evidence on Three Brewing Firms,* Research Paper No. 54. Stanford Workshop on Factor Markets, at ii and 41 (June 1984). Bresnahan and his colleague based this conclusion on their econometric estimate of an extremely high elasticity of demand for A–B products at the consumer level. *Id.*

Bresnahan's prior empirical work demonstrates that although beer is a differentiated product (i.e., consumers have some degree of preference for particular brands), consumers view other brands of beer as very close substitutes for A–B and Miller brands on a nationwide basis.[21] Signifi-

---

**20.** A number of other studies of the beer industry reached similar conclusions. A staff report of the FTC Bureau of Economics concluded that "the weight of the evidence supports the view that the [beer] industry has actually become more competitive and that, in general, performance has been good." Bureau of Economics, Federal Trade Commission, *The Brewing Industry* at 1 (1978). Similarly, Dr. Kenneth Elzinga, after an intensive study of the beer industry, concluded:

> The statistics on the structure of the beer industry, the pricing and marketing conduct oif its members, and the profits it has re-

ceived do not mark it as a monopolized industry. The extent of exits from brewing in the last decade indicate that this is hardly an industry in which an inefficient producer is protected from the chilling winds of competition.

Elzinga, "The Beer Industry," *The Structure of American Industry,* 246 (W. Adams, 6th ed. 1982).

**21.** Bresnahan notes in one of his present reports that retailer demand directly reflects consumer demand. Thus, any conclusions regarding the market power of A–B or Miller at the consumer

cantly, Bresnahan makes no attempt in his two reports submitted in this case to distinguish the market conditions existing in New Jersey between 1978 and 1982 from those which led him to reach his prior conclusions regarding the lack of A–B or Miller market power on a national level.[22] As a result, Bresnahan's prior studies suggest that the A–B and Miller defendants could not have sustained prices for A–B and Miller products above competitive levels without sustaining a net loss in sales revenue, effectively precluding any anticompetitive impact, particularly in the form of higher prices, as a result of exclusive territories.

Dr. Stiglitz also relies on broad economic assumptions regarding the anticompetitive effects of exclusive distribution territories for which he offers no factual support. Stiglitz notes that "[i]n a market without exclusive territories distributors face competition from several sources: (a) from other beverages ...; (b) from distributors of other beers; and (c) from other distributors of the same beer(s)." Stiglitz Report at 6. Stiglitz also notes that "[w]hen [firms] raise their prices, they lose sales for three reasons: each customer may purchase less; customers may be lost to other sellers of the same brand; and some customers may switch brands." *Id.* at 7. He observes that exclusive distribution territories "serve to remove one of the major sources of competition" and further "reduces ... one of [the] three sources of losses of sales." *Id.* at 6 and 7. Stiglitz concludes that exclusive territories will always lead to higher prices than would otherwise exist in the absence of such restraints on intrabrand competition.

The simplicity of Stiglitz's syllogistic argument has a certain superficial appeal,

and at first glance his conclusion appears self-evident. However, on closer inspection, it is apparent that Dr. Stiglitz has merely assumed without factual basis the very conclusion which is at issue here; that is, that the A–B and Miller defendants had sufficient market power to effect unilateral price increases above competitive levels without suffering an offsetting loss of consumer demand to other brands. This assumption is contradicted by the statistical data presented by defendants' economic experts as well as the prior studies conducted by Dr. Bresnahan.

 I conclude that the economic assumptions of Drs. Bresnahan and Stiglitz contained in their respective reports submitted on behalf of plaintiffs in this case do not by themselves generate an issue of material fact on the question of the anticompetitive impact of exclusive distribution territories. Plaintiffs argue that summary judgment is inappropriate in the face of the conflicting opinions of the plaintiffs' and defendants' economic experts. They assert that the mere presence of conflicting expert opinions demonstrates that there exist genuine issues of fact with regard to the impact issue. However, Fed.R.Evid. 703 does not automatically preclude the granting of summary judgment any time an expert for an antitrust plaintiff expresses an opinion on a factual issue which the plaintiff has the burden of proving at trial. In *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C.Cir.1977), the court, speaking through Judge J. Skelly Wright, emphasized that under Rule 703 the factual predicate of an expert's opinion must find some support in the record. The court reasoned:

level will extend to the retail/wholesale distribution level as well. *See* Bresnahan II at 25.

**22.** Plaintifs have attempted to draw certain distinctions in their papers in opposition to the present summary judgment motions. They note that the New Jersey market was more highly concentrated than the nationwide market analyzed by Bresnahan in his prior studies. In particular, they highlight the small number of distributors of A–B brands in New Jersey as contrasted with the total number of such distributors nationwide. While the small number

of A–B distributors in New Jersey might be relevant in assessing the potential for collusion among them in forming a conspiracy to restrain intrabrand competition (discussed infra), it is the total number of distributors of all brands of beer operating in New Jersey which is the relevant consideration in determining whether the wholesale interbrand beer market is so concentrated as to allow anti-competitive pricing practices by the Miller and A–B defendants. Plaintiffs offer no facts regarding total numbers of competing distributors.

To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than ... theoretical speculations would seriously undermine the policies of Rule 56. We are unwilling to impose the fruitless expenses of litigation that would result from such a limitation on the power of a court to grant summary judgment.

*Id.* at 673; *quoted with approval in Pennsylvania Dental Association v. Medical Service Association of Pennsylvania*, 745 F.2d 248, 262 (3d Cir.1984).

██ There is substantial evidentiary support for the opinions of defendants' economic experts that intense interbrand competition in the New Jersey malt beverage market effectively constrained the A–B and Miller defendants from raising the wholesale prices of A–B and Miller brands above competitive levels. The only empirical support for plaintiffs' contention that restraints on intrabrand competition enabled the A–B and Miller defendants to charge New Jersey beer retailers supracompetitive prices for A–B and Miller brands is offered in the yardstick comparison of the pricing of these brands in New Jersey and Indiana performed by Dr. Bresnahan. Thus, plaintiffs' claim of antitrust impact must rise or fall on the evidentiary weight to be accorded Bresnahan's yardstick analysis, which is discussed in the following section on damages.

### C. *Damages*

The third element plaintiffs must prove to establish their antitrust claim is the amount of damages suffered as a result of the alleged antitrust violation. *See American Bearing Co. v. Litton Industries*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116 (3d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973). To sustain this burden "[t]he plaintiff must ... show the amount of damages which have been suffered, using a reasonable method of computation." *Martin B. Glau-*

*ser Dodge Co. v. Chrysler Corp.*, 418 F.Supp. 1009, 1019 (D.N.J.1976), *rev'd on other grounds*, 570 F.2d 72 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Recognizing the unique difficulties in proving damages in antitrust cases, the Supreme Court has relaxed the usual standard of definiteness in establishing the amount of damages. *See, e.g., Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). As Prof. Areeda has noted:

If [the] public function of private damage actions is not to be frustrated, courts must not insist upon unduly rigorous proof of the quantum of the plaintiffs injury, for the marketplace usually denies us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.

*Areeda, supra* at ¶ 343. A jury is permitted to "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579. In reaching its decision, a jury is "allowed to act upon probable and inferential, as well as direct and positive proof." *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). However, "the jury may not render a verdict based on speculation or guesswork." *Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579.

██ In a case such as this involving alleged overcharges in the pricing of a particular product resulting from anticompetitive practices, an antitrust plaintiff is permitted to recover the difference between the anticompetitive price and the price that would have been paid in the absence of the anticompetitive arrangement. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489–90, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968).

The A–B and Miller defendants contend that the overcharges calculated by plaintiff's economic expert Dr. Timothy Bresnahan are demonstrably the product of his methodology and not, as he maintains, the result of restraints on intrabrand competi-

tion. Defendants argue that Bresnahan's Reports can not serve as a factual basis for reaching a "fair and reasonable estimate of damages." I agree for the reasons set forth below and accordingly grant summary judgment in favor of the defendants on the issue of damages.

In December 1985, Bresnahan's first report (referred to as "Bresnahan I") was served on the defendants. In this report, Bresnahan concluded that the existence of exclusive territories for beer wholesalers in New Jersey substantially raised the price of Miller and A–B products to retailers above the level which would have existed in a truly competitive environment. In order to calculate the amount of the overcharges paid by retailers during the relevant time period of 1979 to 1983, Bresnahan utilized a "yardstick" approach in which he compared the pricing of beer by defendants during this period with the wholesale price of A–B beer charged by a single distributor in Indiana, a state which by regulation prohibits the vertical imposition of exclusive beer distribution territories.[23] Based on his "yardstick" comparison, Bresnahan reached the following conclusions quantifying the damages allegedly caused by defendants' horizontal conspiracy to restrain intrabrand competition:

> The actual effect of the distributors' monopoly power was an increase of price over competitive levels estimated at 13.9% using reasonable assumptions about distributors' costs of doing business, or at 7.6% using very conservative assumptions. Under the reasonable percentage overcharge figure of 13.9%, I find that ... [t]he total amount by which retailers were overcharged in the relevant period was $188 million. Of this, $57 million is overcharges for Miller brands of beer, and $131 million for A–B brands of beer.
>
> Using the lower-bound estimate of percentage overcharge, 7.6%, I find that ...

> [t]he amount by which retailers were overcharged in the relevant period exceeded a lower-bound estimate of $102 million. Of this $31 million is overcharges for Miller brands of beer, and $71 million for A–B brands of beer.

Bresnahan I at 31–32.

The oral depositions of Bresnahan was commenced on February 10, 1986. Bresnahan was subjected to intensive examination during which the sufficiency and reliability of the factual basis for his damage calculation was brought into serious question. After three and one half days the deposition was adjourned at the request of defendants who thereafter filed motions for summary judgment on the damage issue. I deferred ruling on the motions and granted plaintiffs additional time for Bresnahan to revise his original report and correct certain admitted errors in his damage calculations.

In his second report, served on defendants in April, 1986 (referred to as "Bresnahan II"), Bresnahan completely altered the methodology employed in his original report. Rather than relying on the prices of a single Indiana distributor of A–B products for his yardstick comparison, Bresnahan obtained price data from six Indiana wholesalers, four of which are distributors of both A–B and Miller beers, and two of which distribute only Miller beers.[24] In addition, rather than performing a straightforward comparison of the prices charged by the defendants and the yardstick Indiana distributors during the relevant time period, Bresnahan compared the prices charged by the defendants in July, 1981 to prices charged by the Indiana distributors in March, 1986. After adjusting for the effect of inflation over time and higher operating costs in New Jersey, Bresnahan arrived at the following damage estimates:

**23.** A regulation promulgated in 1978 by the Indiana Alcoholic Beverage Commission ("Rule 28") prohibited vertically imposed exclusive territories in the beer wholesaling industry. This regulation took effect in 1979.

**24.** The four Indiana distributors of both A–B and Miller brands are Beerco, Tippecanoe Beverages, Bartholomew County Beverages and Rhoades Beverage. The two distributors which sell only Miller brands are Maco Beverages and Hamilton County Beverages.

| Overcharge Percentage Rates | | | Damage Estimate ($millions) | | |
| --- | --- | --- | --- | --- | --- |
| | A–B | Miller | A–B | Miller | Total |
| "High" | 11.0% | 9.78% | $103 | $45.2 | $148.2 |
| "Middle" (Preferred Reasonable) | 7.72 | 6.31 | 72.5 | 31.8 | 104.3 |
| "Low" | 3.77 | 6.42 | 35.4 | 15.5 | 50.9 |
| "Ultra-Conservative" | 1.25 | 3.39 | 11.8 | 5.2 | 16 |

Dr. Bresnahan testified during his subsequent deposition that he "intended that part of Bresnahan I, the exact dollar figure of overcharges, in fact, to be superceded by Bresnahan II." Bresnahan Dep. Tr., 10–42. However, examination of Bresnahan uncovered numerous and substantial errors in his damage calculations. For example, Bresnahan testified that he mistakenly used the A–B overcharge rates to calculate overcharges for Miller products. The consequence of this error was that Bresnahan II overstated damages for Miller brands by $5.8 million under Bresnahan's "reasonable" overcharge estimate. Bresnahan Dep. Tr., 5.153. On another occasion, Bresnahan included the 500 case delivery prices for Miami Beverage under the single case column for overcharge calculations. Bresnahan Dep. Tr. 8.75–78. He further left many of the A–B distributor defendants' quantity discounts out of his calculations. Bresnahan Dep. Tr. 8.147–8.150. These errors also resulted in millions of dollars of overstated overcharges.

During the course of his deposition, Bresnahan submitted revised damage calculation tables on at least three occasions. Each time he redid the Miller damage calculation table at least 80% of the figures on the table changed. In one revision of the A–B damage calculation table, 88 of the 138 figures on the table were revised. In another such revision, Bresnahan introduced a new methodology—the concept of weighing the overcharge percentages for individual packages by volume. With reference to this new approach, Bresnahan testified that "I think it's a new report." Bresnahan Dep. Tr. 9.91–92. In this "new report," Bresnahan estimated damages attributable to the A–B defendants of between $47.7 million under "reasonable" assumptions and negative $17.9 million under "ultraconservative" assumptions. Bresnahan Dep. Tr., 9.113–114. His most recent estimate of the "realistic" measure of Miller overcharges is $28.3 million. Using "conservative" assumptions, Bresnahan concluded that the Miller defendants undercharged by $3.04 million. Thus, Bresnahan's most recent estimate of overcharges by the A–B defendants using "reasonable" assumptions is about one-third the amount originally estimated in Bresnahan I. His most recent estimate of Miller overcharges using "reasonable" assumptions is less than half of what he calculated in Bresnahan I.[25]

In view of the numerous errors which have permeated each successive revision of his damage calculations, it is extremely difficult to share Bresnahan's "high degree of confidence" in his most recent damage estimates. More importantly, however, there is at least one notable factual deficiency in Bresnahan's methodology which undermines his damage calculations. Bresnahan's assumptions relating to the "transition to competition" theory and the so-called "emerging competitive wholesaling sector" in Indiana have no support in the record.

As justification for comparing the prices charged by defendants in 1981 with the prices charged by Indiana wholesalers in 1986, Bresnahan contends that since the adoption of Rule 28 the Indiana beer whole-

---

**25.** In his second report, Bresnahan also analyzed the prices charged by certain Indiana beer wholesalers before and after the adoption of Rule 28. He concluded from this study that the wholesale price of beer fell 12% to 16.55 following Rule 28. Plaintiffs argue that Bresnahan intended his so-called "before and after study" to serve as "a new damage calculation technique." This contention is clearly incorrect. Bresnahan offers the results of his "before and after study" only to support the general proposition that intrabrand competition has the effect of lowering prices and, conversely, that restraints on intrabrand competition enable beer wholesalers to maintain artificially high prices. Nowhere in his report or deposition testimony does he contend or even suggest that his "before and after study" of wholesale pricing in Indiana could be utilized as a reasonable methodological means of calculating the amount of damages sustained by plaintiffs as a result of restraints on intrabrand competition in New Jersey.

saling market has been undergoing a transition from a system of exclusive territories to a system of free and open competition among distributors. Under Rule 28 beer distributors anywhere in the state of Indiana can not be contractually or legally prevented from serving any retail account anywhere in the state. According to Bresnahan, Rule 28 has given rise to heightened intrabrand competition which has prompted an increasing number of wholesalers, the competitive ones, to reduce their prices in order to compete more effectively. Bresnahan argues that this process of transition to free and open intrabrand competition in Indiana following the banning of exclusive territories is continuing even into the present time. Thus, he contends that the full impact of Rule 28 on the wholesale pricing of beer by "competitive" distributors has not yet been felt. As a result, Bresnahan asserts that 1986 Indiana prices provide a closer approximation of the prices which would have been charged by the A–B and Miller defendants absent the alleged illegal restraints on intrabrand competition.

Bresnahan relies on his "transition to competition" theory to justify the use in his yardstick comparison of the wholesale prices of an extremely limited and select sample of Indiana distributors. As noted above, Bresnahan draws a definitive distinction between "competitive" and "noncompetitive" wholesalers in Indiana. Bresnahan argues that Indiana wholesalers were confronted with only four options:

(1) sell only inside their APR, maintaining prices substantially above those charged by competitive wholesalers. The effect of this strategy would be steadily shrinking volume ... [and] profitability over time, as the firm will be able to continue to have sales only at those accounts which no outside competitive wholesaler seeks to serve.

(2) sell only inside their APR, meeting the prices of competitive wholesalers. This ... "keep what you have" strategy ... leads to smaller profits than those that were being earned before the out-

break of competition, since volume will be about the same and gross margins will be much smaller....

(3) leave the beer distribution business.

(4) grow and compete.

This choice would involve meeting the prices of competitive wholesalers, actively seeking new accounts outside the firms' APR, and building volume ... Bresnahan II at pp. 4 & 5. Bresnahan maintains that only those wholesalers who chose either the second or fourth options would be able to effectively compete in the Indiana market. He concludes that only the prices of such "competitive" wholesalers should serve as the basis for a yardstick comparison with the 1981 prices of the defendants.[26]

There is thus no dispute that Bresnahan utilized the prices charged by the lowest priced wholesalers in Indiana in his yardstick comparison. Defendants contend, and plaintiffs do not dispute, that the prevailing prices charged by so-called noncompetitive wholesalers throughout much of Indiana are higher than those of Bresnahan's "competitive wholesalers." For example, one of defendants' economic experts, Prof. Myslinski, compared the prices charged by A–B's Indianapolis distributor, B–F Beverage, with those charged by the A–B defendants during the relevant time period. He found that B–F Beverage's prices were on average no lower than the prices of the A–B defendants. Using the prices of B–F Beverages as a yardstick resulted in no damages. Myslinski Report at 94–99. Clearly, Bresnahan's choice of Indiana yardstick distributors had a dramatic effect on his damage calculations. Thus, the factual sufficiency of his damage estimates for purposes of the present summary judgment motions rests in large measure on the validity of his "transition to competition" theory.

Other than vague references to the exiting of firms from the beer wholesaling

---

**26.** In fact, for reasons he does not explain, Bresnahan used the March, 1986 prices of only those wholesalers who sold to accounts beyond the boundaries of their APRs. Bresnahan Dep. at 7.40:3–21.

business in Indiana and the merger of these firms into surviving firms, phenomena which he concedes would be unlikely to occur if an analogue of Rule 28 were adopted in New Jersey, Bresnahan offers no facts to support his contention that the Indiana beer distribution market is undergoing a transition to competition which will result in progressively lower prices charged to retailers.[27] Bresnahan assumes that only low-priced, so-called "competitive" wholesalers will prosper and grow over the long-term in Indiana. In particular, Bresnahan assumes that distributors who choose not to compete for retail accounts beyond the boundaries of their APRs or do not lower their prices to meet competition from outside wholesalers will suffer dramatically declining profits or be forced out of business. However, other than vague references to the shrinking market share of "non-competitive" wholesalers, Bresnahan once again offers no facts to support the above assumptions. He does not cite to a single "non-competitive" wholesaler whose business has been shrinking. Nor does he cite to a single wholesaler which has gone out of business since 1979 or the circumstances which contributed to its demise. Defendants on the other hand have set forth specific facts which directly refute Bresnahan's assumptions regarding the alleged "transition to competition."

The "competitive" wholesalers upon whose prices Bresnahan relies in his report have not taken over the marketplace as Bresnahan's theory predicts. Out of approximately 57 A–B distributors in Indiana, Bresnahan concedes that only between six and twelve of them fit his narrow definition of a "competitive" wholesaler. Bresnahan Dep. Tr. at 11.138. Thus, the vast majority of wholesalers in Indiana have opted to refrain from selling to retail accounts located outside their APRs and have presumably maintained higher prices notwithstanding the risk of competition from lower-priced wholesalers outside their APRs. Nevertheless, over seven years after the enactment of Rule 28 these so-called "non-competitive" wholesalers have continued to survive and sell to retailers in markets which Bresnahan himself describes as competitive. For example, Bresnahan states in his report that Indianapolis is a "competitive market." Bresnahan II at 6. He further testified during his deposition that the "competitive" wholesalers whose prices he utilized in his yardstick analysis sell to retail accounts located in Indianapolis. However, Bresnahan maintains that it is not appropriate to use the prices charged by B–F Beverage, which is actually located in Indianapolis, because B–F Beverage

---

**27.** Bresnahan's "before and after" study might arguably provide some support for his "transition to competition" theory. Bresnahan argues that this study shows that the average deflated wholesale price of A–B and Miller beer in Indiana during the period of 1979 to 1986 was 12% to 16% lower than during the period of 1971 to 1977. However, the three graphs depicting the results of his study clearly show that the average deflated price of Miller and A–B brands had been steadily declining since 1971 and that such prices actually levelled off shortly after the time Rule 28 took effect in 1979. Rather than continuing the overall trend of falling prices, the average deflated price of A–B and Miller beer remained remarkably constant between 1980 and 1986 and even increased slightly. Bresnahan II, Figures 2, 3 & 4, at pp. 15–17.

Furthermore, Bresnahan made no attempt in his before and after study to control for variables other than the adoption of Rule 28, such as intensified interbrand competition possibly resulting from the introduction of new brands into the Indiana market or lowered laid-in costs of beer from the manufacturers, which might have contributed to decline in wholesale prices. Indeed, in a study of the brewing industry released in 1978, the FTC made the following observations:

The Consumer Price Index for beer has risen at a slower rate than has the Consumer Price Index for all goods, indicating that the real price of beer has been falling over time. Again, by itself this fact does not necessarily indicate anything about competition in the industry. Costs in brewing may have risen less rapidly than the average because the industry is relatively capital-intensive and becoming more so. However, the data on profits indicate that the industry was unable to retain the benefits of cost reductions for itself (relative to the average for all products); thus, the implication is that competition forced any savings in cost to be passed on to consumers. Bureau of Economics, Federal Trade Commission, *The Brewing Industry* at 3 (1978).

I conclude that Bresnahan's before and after study does not provide a factual basis for his "transition to competiton" theory.

does not fit his definition of "competitive." Bresnahan II at pp. 57–58.

In addition, there is evidence that the competitive wholesalers that Bresnahan utilized in his yardstick analysis have not been capturing ever-increasing shares of the Indiana market. As one of defendants' economic experts points out in his report:

Professor Bresnahan's transition argument is contradicted further by the fact that the share of his "competitive" distributors has not increased over the 1981 to 1985 period. Indeed, when I calculate the combined share of Tippecanoe, Miami and Rhoades over the 1981 and 1985 period, I find that their share of beer sales in Indiana dropped from 17.4% to 15.5%. Thus, the data do not indicate a "transition to competition which is not yet complete."

Hausman Report at 29. In the short time since Bresnahan completed Bresnahan II, two of the six Indiana wholesalers utilized in his yardstick analysis have gone out of business having sold out to other firms. One such wholesaler, Hamilton County Beverages, reportedly sold out because it was not making money. Linneman Affidavit, ¶ 8. Indeed, Bresnahan admitted that each of the "competitive" Indiana distributors used in his yardstick analysis had been forced to restrict the areas in which they were attempting to compete:

Q. Now the geographic area that is actually served by these competitive wholesalers is shrinking isn't it, by any given one of them; they're retrenching. They're not selling to as many accounts as far away from their warehouse as they used to; right?

A. Right.

Bresnahan Dep. Tr. at 12.24.

The above evidence suggests that the efforts of Bresnahan's so-called "competitive" wholesalers to penetrate markets outside their assigned APRs merely by charging lower prices has not brought about results consistent with his "transition to competition" theory. Rather, price does not appear to be the primary determinant of the long-term success or failure of beer

wholesalers, as Bresnahan argues. Instead, there must be factors other than price, such as superior service, which are influencing Indiana retailers to continue buying from allegedly higher priced wholesalers and which Bresnahan has not taken into account in his yardstick analysis. More importantly, the above evidence suggests that the decision of the vast majority of Indiana distributors to concentrate their sales and merchandizing activity within their APRs and to refrain from reducing their prices to meet outside competition represents an efficient and competitive response to the wholesale beer market in Indiana following the adoption of Rule 28. Thus, Bresnahan's assumption that absent restraints on intrabrand competition the prices charged by the defendants in 1981 would have resembled the deflated prices charged by his yardstick Indiana wholesalers in 1986 appears to be entirely without factual basis.

Bresnahan has not provided a factually supported rationale for limiting the yardstick to the prices of just six of the "competitive" wholesalers and for excluding from his yardstick comparison the prices of the other "competitive" wholesalers and of all the so-called "non-competitive" wholesalers. Thus his computation of damages lacks a foundation.

Defendants advance a number of other grounds to attack Bresnahan's conclusions: (i) he failed to show that the firms and markets selected as yardstick are comparable to the allegedly restrained firms or markets except for the effect of the alleged antitrust violation. (see Bresnahan Dep. Tr. 7.127–135); (ii) he failed to take into account major cost differences between the Indiana and New Jersey wholesale beer distribution markets, e.g., labor costs and non-labor costs such as insurances and cost of capital; (iii) Bresnahan failed to adjust for other significant differences between the wholesale operations of Indiana "competitive" wholesalers and those of the wholesalers in New Jersey, such as different service levels and different regulatory constraints; (iv) Bresnahan improperly used the March 1986 prices as his yardstick

because use of a one month period for a four year damage estimate is an unaccepted econometric practice (i.e., provides no basis for a reasonable inference); (v) Bresnahan's use of the GNP deflator was not a reasonable basis to account for inflation in beer wholesaler costs since he had available a deflator applicable to a beer distributor's costs.

■ Certain of these contentions present no material issues of fact. Others involve disputes between the parties' expert witnesses and in other ways do present material factual issues. However, in view of the conclusion that the selection of prices charged by the so-called "competitive" wholesalers as the foundation for the damages competition did not have a rational basis, it is unnecessary to analyze each of their other contentions.

I conclude, therefore, that defendants are entitled to summary judgment on the issue of damages.

In the discussion of proof of impact in Section VB above, I concluded that plaintiffs' claim of antitrust impact must rise or fall on the validity of Bresnahan's yardstick analysis. Having found that the yardstick analysis lacks a rational foundation, it follows that plaintiffs have failed to adduce evidence on the basis of which antitrust impact could be found.

## VI. CONCLUSION

Defendants are entitled to summary judgment in their favor on the issues of conspiracy, antitrust impact and damages. It is unnecessary to address the alternative motion for class decertification. Defendants' attorneys are requested to present an appropriate form of order.